CARLTON *et al. vs.* THE SOUTHERN MUTUAL INSURANCE COMPANY *et al.*

| 72 | 371 |
| 106 | 496 |
| 72 | 371 |
| 6119 | 897 |
| 72 | 370 |
| 124 | 466 |

1. Where a mutual insurance company filed a bill in equity, alleging that a large surplus fund had been accumulated by reserving certain amounts from the premiums paid in by the mutual insurers; that this surplus had become amply sufficient, and was in danger of becoming too large; that certain questions had arisen concerning it and the interest arising from it; and praying that the charter might be construed and interpreted "so that by the decree in this case the legal status of the reserve fund may be finally and definitely determined and fixed, and so that it may be ascertained and declared who are its lawful owners, and who are entitled to share in any division of the fund itself or of the income produced by it,"— such bill brought the reserved fund before the court, and cross-bills on the part of some of the defendants, setting up rights or claims as to the fund were germane to the litigation and not demurrable.

(*a.*) If a cause of action arose by the filing of a bill, and is germane to it, or if it existed before, and the bill uncovers facts transpiring before it was brought, and discovers equitable rights to the defendants, they may ask relief arising from those facts by cross-bills, and need not bring a separate action.

2. Where a mutual insurance company filed a bill, and selected certain individuals of each class of persons interested, as representatives of such classes, on the ground that service could not be made on all the class, and the defendants entered the litigation into which they had been invited, and, through their representatives,

filed cross-bills setting up their rights, they were not outsido parties to the litigation, and it is not just to dismiss their cross-bills, and thus turn out of court both the class whom the select men represent, and the men so selected by the company itself.

3. If the reserved fund is more than the charter, or the resolutions of the directors authorized, or than the necessities of the company and its expenses and reasonable expectation of losses require, the protest against it is clearly expressed in the cross-bills, and amply sufficient to make an equitable issue thereon.

4. An allegation in the cross-bills that there was nothing on the books of the company to put the defendants filing such cross-bills on notice that more than ten per cent of annual profits had been reserved, and that a resolution of the directors announced that they would not go beyond that per cent on profits annually, or $200,000 in bulk, and that such defendants had no actual notice of any sort, was sufficient, and should not have been dismissed on demurrer.

5. When the defendants are brought into court as a class or classes, they may defend in the same manner, and if a cross-bill be a legitimate mode of defence, by asserting rights springing out of the subject-matter of the bill, and asking relief thereon, it may be filed by them as a class.

6. A mutual insurance company is based upon the idea that each of the assured becomes ono of the insurers, thereby becoming interested in the profits and liable for the losses. Without a charter, such an organization would be governed by the general law of partnership. When incorporated, they are subject to the terms of their charter. The charter stands in tho place of articles of partnership, and modifies the general law as respects losses and profits. where the two conflict. But except as changed by the charter, equity will apply the general laws of partnership in respect to interest in and division of profits.

7. The fundamental principle at the base of all partnerships is a division of profits or losses in some form or degree, equal or otherwise, as the terms may be; and in a mutual insurance company the idea of mutuality involves the result that each assured becomes interested in profits and liable for losses.

8. The Southern Mutual Insurance Company, in its charter, its essence and its very name, is a mutual insurance company, and every stockholder is interested in the profits; and when the fund remaining, after paying losses and expenses, swells beyond the necessities of the corporation, and the excess becomes subject to distribution, he participates in the division. His obligation to pay losses is to the amount of premium required of him, and his privilege is to participate in the profits, when the fund reserved for the necessities of the corporation becomes larger than necessary.

9. The terms "stockholder" and "member," as used in the charter of this company are synonymous, and a stockholder, in respect to division of profits, is he who puts stock in the company in the shape of premium money (the only stock in such company consisting of premiums paid to insure property); and if what he puts in contributed to make a surplus fund of profits, whether in or out when the division is made, he remains a member to draw his share of such profits according to the amount of his premiums paid, pro rated with that paid by others, who also contributed to the accumulation.

10. The effect of paying premiums by notes or in cash discussed.

11. If the surplus over a proper reserve fund was in the coffers of the company, and it appears that it should have been divided while a member was still insured, and that the division would have allotted to him a part, equity will decree that this be done now, and will distribute it as it would have gone then.

12. The essence of mutuality is that those who contribute to produce assets are interested in proportion to their contribution, and if others manage for them as beneficiaries or *cestuis que trust*, the managers being trustees, equity will prevent misappropriation, or decree restoration, if improperly withheld.

13. By resolutions in 1855, the directors provided for a reserved fund, fixing ten per cent on profits as the annual contribution thereto, and for the remaining part of the profits scrip was to be issued annually to the policy-holders for one year, to be paid when the cash means of the company amounted to $200,000. Whatever was not issued to a then stockholder entitled to it, he is entitled to now

14. The act of 1856, amending the charter of this company, did not destroy its mutual character. It gave the right to reserve a fund necessary to meet emergencies, and then retained the mutuality of all stockholders in participation in profits made during their term of insurance.

(*a.*) The limit of $200,000 cash, as fixing the time when the scrip should be paid, would not apply to all years. With the increase of business and the increase of risk, proportionately will the amount of cash necessary to meet that risk increase.

(*b.*) If the resolutions of 1855, and other similar resolutions, fixing the issuance of scrip, after deducting ten per cent, were published from year to year to invite insurance, and some of the defendants were induced thereby to insure, it would add weight to their right to hold the company to its publication and to keep the directors within the limits of the reserve which they thus fixed, and appropriate the balance to profits for stockholders.

15. The equity of those forced out without fault is greater than that of those voluntarily retiring, but in neither case would the termination of the insurance forfeit the profits previously made.

16. No statute of limitations can apply to all of these cross-bills, many of the defendants filing them having been insured but a year or two before the bill was filed. Besides, the relation makes a sort of continuing trust, and the statute does not bar, especially until the limit is complete, after knowledge of the acts of the trustees which made the fund accessible for distribution. Knowledge or opportunity therefor is denied in these cross-bills.

17. No demand was necessary on the part of the defendants before filing the cross-bills; but from abundant caution a demand was made before the last cross-bill was filed.

18. Directions given to the court below as to the mode of ascertaining what would be a legitimate reserve, what amount would be for distribution, and how a distribution should be effected.

19. In fixing the amount of the reserved fund, regard must be had to the present, past and future, and equity will so direct as to do justice to all.

June 10, 1884.

Insurance. Corporations. Stock and Stock. Before Judge ESTES. Clarke Superior Court. November Term, 1883.

To the report contained in the decision, it is only necessary to add the following: On May 26, 1881, the Southern Mutual Insurance Company, through its directors, filed its bill in Clarke superior court against Lampkin *et al.* and Carlton *et al.*, alleging, in brief, as follows: The company was chartered by act of the legislature in 1847, and its charter has been amended three times since, in 1849, 1856 and 1866. The amended charter is set out hereafter. The company was organized strictly upon the mutual plan, "and upon that plan all its operations have been conducted." There are no stockholders, in the ordinary sense of the term, the policy-holders, officers and agents exer-cising control over the affairs of the company, and the policy-holders being treated as occupying a relation most nearly corresponding to that of stockholders.

The principal office was first in Griffin, but in 1849 was moved to Athens. At first, the company insured both lives and property, but in 1855 it ceased the business of life insurance.

Carlton *et al. vs.* The Southern Mutual Insurance Company *et al.*

" From a very early period in its existence, it has been the policy of the company, as indicated in its charter, to accumulate a reserved fund which would be sufficient to furnish an ample guaranty to the holders of policies in the company. This purpose has been strictly adhered to, and a reserve gradually accumulated, which, it is reasonably certain, affords ample protection to the policy-holders against the present amount of risk. At the same time, the company have also pursued the policy of dividing among the policy-holders, in the shape of dividends, almost the whole of the annual profits arising from premiums.'·

In 1855, the directors adopted the following resolutions, which were ratified in the same year by the annual meeting :

" 1. From and after the first day of July, 1855, the whole premium is required to be paid in cash, without discount or abatement.

" 2. All holders of one-year policies shall be entitled to participate in the profits of the company, for which profits, after deducting from 5 to 10 per cent, at the discretion of the directors, for an accumulated fund, scrip shall be issued annually; provided that the first scrip issued shall be for profits from the 1st July, 1855, to the 1st September, 1856.

" 3. Whenever the cash means of the company shall amount to two hundred thousand dollars over the dividend first declared, the directors shall order the payment of the first scrip issued. In like manner, subsequent issues of scrip shall be paid in their order.

" 4. The profits to be divided as above are taken to be whatever may remain from the receipts of each year, after deducting all the losses of the year, whether paid or unpaid, as well as commission, salaries and other expenses.'?

The bill alleges that this plan was put into operation, and has since been pursued down to 1879, when certain other sums were added to these amounts derived from premiums.

" Under the operation of this policy, and carrying out these regulations," there have been annual dividends, and a reserve has also been laid up, which at present amounts to $912,803:19, face valuation, but is invested in stocks, etc., the actual market value of which is much more. The

interest on the reserve fund has been added to it until 1879. The total amount at risks when the bill was filed was $17,650,728.00.

"The entire past experience of the company points to and justifies the conclusion that the present reserve fund is abundantly sufficient to afford ample protection to the policy-holders against danger from that amount of risk. Unless, therefore, the amount at risk should be increased, no reason suggests itself why the reserve should be allowed to become larger than it is."

At the annual convention in 1872, a resolution was adopted allowing the directors to increase the dividends by dividing the interest on the reserved fund, and in 1879–80, this was done.

"This action, it is believed, was rendered necessary, in order to prevent an accumulation of surplus funds beyond the amount contemplated by the charter, the limit being considered to be whatever amount the judgment and discretion of the directors, guided by experience, shall fix as a sufficient reserve. That point being reached, it is necessary to pay out the interest, in order to prevent the further increase of the fund."

"With the present amount and volume of business, the reserve is large enough. The officers of the company, realizing that they hold it as trustees for the true owners, and remembering that it is the result of the steady accretions of thirty years of successful business, and that the innumerable payments of all who have ever been policy-holders have all contributed, like Peter's pence, each almost imperceptibly, to swell it to its present proportion, and in view of the uncertainty as to the true intent and meaning of the charter, are unwilling to assume the responsibility of paying out any more of it, until it is judicially determined who are entitled to receive it.

"As to this, the following questions have presented themselves, which they are not able to decide:

"To whom does this reserve fund belong? Are those

who are the holders of one-year policies at this time the owners? If so, upon what basis shall a division among them be made, or are they and all who have ever held policies the lawful owners, or are all who have held policies heretofore, since a certain date, joint owners, and those before that date excluded, and if so, what date constitutes such a bar? Your orator is advised that the income follows the *corpus*, and that, in order to ascertain who are the lawful recipients of dividends of its interest, the questions above stated, as to the ownership of the fund itself, should be determined."

The second and fourth sections of the charter are all that cast any light upon the question of stockholders, and the by-laws are silent upon the subject.

Those who have ceased to be policy-holders may be divided into two classes: (1.) Those who have ceased voluntarily; and (2) those who were cut off by the company involuntarily.

To the second class belong a large number of those who held policies in South Carolina, Florida, Alabama and Mississippi. They had regularly paid their premiums, complied with all the requirements of the company, were not in default, and desired to continue as members; but it was believed that, in view of legislation in those states, the safety and interests of the company required a withdrawal therefrom. This took place as follows: From South Carolina, in 1869; from Florida, in 1872; from Alabama, about the close of the war; from Mississippi, before the war.

"No account and settlement was had with these policy-holders at the time or since these withdrawals, and no demand or claim of any interest in any accumulation has ever been made by them."

Though empowered to insure for as long as ten years, it has long been the practice to issue no policy for a longer time than one year. Risks for a shorter time are made by what are termed "insurance receipts." It has also been

the practice at the end of a year to extend policies by what are termed " renewal receipts." The status of these insurance and renewal receipts is also a matter of doubt.

" In the event that it should be held that the term 'stockholder,' as employed in the charter, means those only who at the time are the holders of one-year policies, and that consequently they only are entitled to receive any dividends that may be declared from the reserve fund, the question still remains, upon what basis shall it be divided among them? The expression, 'according to the respective amounts of their premiums,' is ambiguous."

On account of the large number of people in interest, all of them were not made parties defendant by the bill; but only certain selected persons, as representing various classes of present and past policy-holders.

" Your orator therefore charges that the reserve fund of this company is now large enough, and should not be increased; that its growth from its own interest alone is now so rapid that, unless checked, it will go to near a million dollars before the end of the present year; that it is reasonably certain that the time has now come, spoken of in the charter, when a division of its income at least should be made among the stockholders; that in view of the grave doubts springing out of the charter and hanging over the questions, who are the stockholders in this company as used in the charter, who are the lawful owners of this surplus, and what persons are entitled to share in any division that may be made of this fund or its issues, and upon what basis that division should be made, what is the legal status in this company of the holders of insurance receipts and renewal receipts, and in view also of the amount involved, and the weight of responsibility resting upon the officers of this corporation, a judicial determination of all these disputed questions, and a decree giving the company direction in the premises, are imperatively demanded."

The prayers of the bill were as follows:

(1.) " That the charter of this company may be construed and

interpreted, so that by the decree in this case the legal status of the said reserve fund may be finally and definitely determined and fixed, and so that it may be ascertained and declared who are its lawful owners, and who are entitled to share in any division of the fund itself or of the income produced by it, and so that the term stockholders, as used in the charter, may be interpreted so as to remove all doubt and uncertainty as to the true intent and meaning of that instrument.

(2.) "That in the event that none others but present policy-holders are intended by the word 'stockholders,' that it may be settled by the decree upon what basis a division among them shall be made."

(3), (4.) That the legal status of renewal and insurance receipts be determined.

(5.) That Lampkin, Hull, Grant and Warren be made parties as representatives of the class of present policy-holders.

(6 ) That Carlton and Lowrance "may be made parties defendant to this bill, representing and defending for themselves, and for all others who were formerly policy-holders in this company, but are not now, and whose connection was terminated otherwise than by the company's act alone, so that all those aforementioned, who were formerly policy-holders in this company, but are not now, and whose connection was terminated otherwise than by the company's act alone, as well as the said Carlton and Lowrance, may through them be parties defendant to this bill, and bound by the decree."

(7), (8), (9), (10.) That Petit and Trenholm be made parties representing the South Carolina policy-holders, and Scott and Swann, representing the Florida policy-holders; and that they be served under order of court; that if there be surviving or legally represented any former policy-holders of Alabama and Mississippi, "who shall be decreed to have any rights in the premises," the proper rule and order be taken as to them.

(11.) "That, in the event that it should be decreed that any of these parties defendant have rights to any sum or sums hereinbefore referred to, that your Honor will appoint some suitable and proper person a receiver, if desired by the company, for their benefit, to whom the company may pay over such sum or sums as may be proper, so as not to interfere with the future operations of the company, and who shall disburse the same subject to the order of your Honor and the decree in this case."

(12), (13.) For general relief and subpœna.

The second and fourth sections of the charter (as amended), referred to in the bill, are as follows:

"Sec. 2. *And be it further enacted,* That at all meetings of said corporation, every matter shall be decided by a majority of votes, each member holding a policy for one year or longer being allowed one vote, and if his policy exceed one thousand dollars, an additional vote for every thousand (provided, that insurers under open policies shall be entitled to vote in proportion to the amount insured under their policies; *and provided further*, that no insurer under an open policy shall be entitled to more than ten votes), with the right of voting by proxy, and such corporation may choose such officers, and for such length of time as they may deem necessary, but no policy of insurance shall be issued by said company until the sum subscribed to be insured shall amount to fifty thousand dollars."

"Sec. 4. *And be it further enacted,* That whenever said corporation shall make any insurance on any property, the member so insured shall pay the required premium in cash, or give his note or bond, well secured, for the amount of the insurance money, payable one day after date, and shall deposit in money, with the treasurer of the corporation, at least ten per cent of said note, which shall be entered as a credit thereon, and the funds thus raised may be applied to the payment of the losses and expenses of the corporation, and in the event of an accumulated surplus beyond the necessities of said corporation, the directors are hereby authorized to divide the same among the stockholders thereof, according to the respective amounts of their premiums, and the directors may, at any time when the necessities of the company require it, collect such further sums as may be necessary by making assessments on said notes, in proportion to the original amount of each note, giving thirty days' notice by mail to each member, but no member shall, in any event, be liable to pay more than his premium note or cash premium."

Hull and Lampkin filed an answer to the bill, in which they substantially concurred in the allegations of fact made in the bill, and asserted that the accumulation of the surplus was authorized in the charter and was necessary; that only those who have annual policies at any given time are interested in the surplus or its proceeds; that all who had ceased to hold policies, whether voluntarily or involuntarily, had lost their interest; and that the foreign policyholders were barred by the statute of limitations.

Cobb *et al.* (some of whom held present policies and

some past policies, and all of whom claimed to be interested in the litigation) were made parties, and filed an answer similar to that of Hull and Lampkin.

Purse and others were also made parties, and substantially adopted the answer of Hull and Lampkin.

Carlton, for himself and his class, filed an answer and cross-bill; and other persons, some of whom were still insured in the company, and others of whom had ceased to insure, were made parties defendant. Some of these joined with him in his answer and cross-bill, and some of them filed separate answers and cross-bills to the same general purport, as set out in the decision.

After the filing of the cross-bill of Carlton, the complainant filed an amendment to the bill and answer to the cross-bill, giving various details of the business, the only portions of which answer material to be set out here are, in brief, as follows : The fiscal year, when the company was first organized, extended from September 1st to August 31st, but has been changed so as to extend from May 1st to April 30th. The change from the premium note system to the cash system was made in 1855. In 1859, the surplus reached and passed $200,000.00. During the war, there were numerous losses, and on May 1, 1865, the face value of the securities was $225,632.99, but the actual value was less. Their market value reached $200,000.00 on May 1, 1867. In addition to the Confederate losses, the ordinary losses and expenses exceeded the premium income in 1850, 1852 and 1854. Policy fees of one dollar on each policy have been received by agents as perquisites. Owing to the length of time, the number of policy-holders and the nature of the business, the decree sought by Carlton. *et al.* would be exceedingly difficult to execute. The amount due him, if any, is very small. In the following years, the entire earnings, together with a portion of the interest from the reserve fund, were paid out as dividends : 1860, 1861, 1862, 1867, 1873, 1878, 1879, 1880, 1881.

Complainant again amended its bill, alleging, in brief,

as follows: The company was organized on February 5, 1848, under its charter of 1847, upon the premium note system, that is, each insurer deposited a note for the premium on his policy, paid ten per cent in cash, and was assessed, if necessary, to meet other losses and expenses. An annual report was made in 1848, and, together with the charter and by-laws, was printed for the use of members, and to induce others to insure. Each year since then, an annual report, containing all of the material proceedings and facts as to its affairs, has been published for free distribution. In 1850, a by-law was adopted that "every person insured in this company for one year or more shall be considered a member thereof." This, with the amendments to the charter, was published. The stockholders had notice, and were bound by the proceedings. They attended the annual meetings, or wilfully neglected to do so, and trusted to the honesty and integrity of those present. In the charter and by-laws, the words "member" and "stockholder" have been used interchangeably to mean persons holding policies and entitled to vote. In 1855, the resolution stated in the bill was adopted, and was acted on until June 4, 1867, when it was amended by providing that, when the profits of any year should not exceed ten per cent of the premiums received, no dividends should be declared for that year, and that no scrip should be issued for less than one dollar. No member has any right or interest authorizing him to claim any part of the reserved fund, except dividends set apart to him; and for that scrip has been issued and paid, or taken for re-insurance. Policies have been issued on the faith of the fund, and insurance cheapened thereby, and each insurer undertook to leave the specified per cent of his profits in the fund. The surplus is not larger than necessary. The directors, or they and the stockholders, have so determined.

The six years' statute of limitations, the twenty years' statute, and the limitations act of 1869, were pleaded. Since 1852, only annual policies have been issued, and re-

newals are new contracts. Upon the termination of each policy, the interest of the policy-holder ceases.

"The company desires to continue its business, disposing of its income as heretofore, and reserving the *corpus* of the reserve fund, to be dealt with as its charter directs. No man not holding a year-policy has any right to any of said fund, and the majority of those holding such policies can and will control the matter as the charter directs."

Several amendments were made to the cross-bills. As amended, they made, in brief, the points stated in the decision, in addition to denying any bar of the statute of limitations. The demurrer and motion to dismiss, the dismissal of the cross-bills by the chancellor, and his subsequent rulings, together with the verdict, decree and grounds of exception, are all sufficiently set out in the decision.

HENRY JACKSON ; J. H. LUMPKIN ; H. H. CARLTON ; E. K. LUMPKIN, for plaintiffs in error.

N. J. HAMMOND ; POPE BARROW ; L. & H. COBB ; A. J. COBB ; W. S. BASINGER ; ALEX. S. ERWIN, for defendants.

JACKSON, Chief Justice.

This is a bill for direction brought by the Southern Mutual Insurance Company, through its directors, alleging that its reserve fund had swollen to $912,803.19, was rapidly increasing, and would soon reach a million of dollars, and praying the instruction of the court in respect to its status, how it should be distributed among present policy-holders, and various classes of past policy-holders, when ready for distribution, on future increase by its own accumulations from interest or otherwise, and who were its true owners, so as to entitle them to share in the distribution. All persons who had taken fire insurance policies, life insurance having been long abandoned, were made parties defendant in classes, certain individuals be-

ing served, representing each class. One class was pres-
ent policy-holders, another were residents of other states,
having property in those states insured, and, those states
being abandoned, were dropped by the company; and
the other, which the company made defendants, was the
class of past policy-holders. Other individuals came in
and were made parties, on motion; among them some
whose locality in Georgia had been abandoned. The di-
rectors alleged and desired to be informed by the court as
follows:

"Your orator, therefore, charges that the reserve fund of this com-
pany is now large enough, and should not be increased; that it;
growth from its own interest alone is now so rapid that, unless checked,
it will go to near a million dollars before the end of the present years
that it is reasonably certain that the time has now come, spoken of
in the charter, when a division of its income at least should be made
among the stockholders; that in view of the grave doubts springing
out of the charter and hanging over the questions, who are the stock-
holders in this company, as used in the charter, who are the lawful
owners of this surplus, and what persons are entitled to share in any
division that may be made of this fund or its issues, and upon
what basis that division should be made; what is the legal status in
this company of the holders of insurance receipts and renewal re-
ceipts; and in view also of the amount involved, and the weight of
responsibility resting upon the officers of this corporation, a judicial
determination of all these disputed questions and a decree giving the
company direction in the premises, are imperatively demanded."

And in pursuance of this desire, they prayed as follows,
in substance:

(1.) "That the charter of this company may be construed and in-
terpreted, so that, by the decree in this case, the legal status of the
said reserve fund may be finally and definitely determined and fixed,
and so that it may be ascertained and declared who are its lawful
owners, and who are entitled to share in any division of the fund
itself, or of the income produced by it, and so that the term stock-
holders, as used in the charter, may be interpreted so as to remove
all doubt and uncertainty as to the true intent and meaning of
that instrument.

(2.) "That in the event that none others but present policy-hold-
ers are intended by the word 'stockholders,' that it may be settled
by the decree upon what basis a division among them shall be made."

(3), (4.) That the legal status of renewal and insurance receipts be determined.

(5.) That Lampkin, Hull, Grant and Warren be made parties as representatives of the class of present policy-holders.

(6.) That Carlton and Lowrance "may be made parties defendant to this bill, representing and defending for themselves, and for all others who were formerly policy-holders in this company, but are not now, and whose connection was terminated otherwise than by the company's act alone, so that all those aforementioned, who were formerly policy-holders in this company, but are not now, and whose connection was terminated otherwise than by the company's act alone, as well as the said Carlton and Lowrance, may through them be parties defendant to this bill and bound by the decree."

(7), (8), (9), (10.) That Petit and Trenholm be made parties representing the South Carolina policy-holders, and Scott and Swann, representing the Florida policy-holders; and that they be served under order of court; that if there be surviving or legally represented any former policy-holders of Alabama and Mississippi, "who shall be decreed to have any rights in the premises," the proper rule and order be taken as to them.

(11.) "That, in the event that it should be decreed that any of these parties defendants have rights to any sum or sums hereinbefore referred to, that your Honor will appoint some suitable and proper person a receiver, if desired by the company, for their benefit, to whom the company may pay over such sum or sums as may be proper, so as not to interfere with the future operations of the company, and who shall disburse the same, subject to the order of your Honor and the decree in this case.

(12), (13.) For general relief and subpœna.

The substance of which allegations and prayers is, that the directors desired to be instructed as agents and trustees, and desired, as such, to know who were interested in this fund, and after deducting therefrom such portion as was necessary reasonably to conduct the business of the company in payment of losses which might probably arise from fire, and expenses, salaries, etc., who would be entitled to it, and how it or its issues should be distributed among these classes of persons insured by it, and who had paid premiums into its coffers. The defendants answered the bill, representing others of their class, as well as themselves, each class in its answer asserting its right to participate, and some filing cross-bills, and praying discovery

in regard to the time within which contributions had been made to the funds not expended, and which, by accumulations and investments, had swollen into this large surplus. On demurrer to the cross-bills of defendants, those bills or answers in the nature of cross-bills, were stricken and dismissed.    On the hearing before the jury, the court refused to submit these issues to the jury :

"(1.) From what sources was the accumulated surplus or reserved fund derived ?

"(2.) Was more than ten per cent of the profits of any year's business carried to the reserved fund ; if yes, for what years, and how much each year ?

"(3.) Was more than ten per cent of the gross premiums for any year carried to the reserved fund ; if yes, for what years and how much for each year ?"

In reply to the questions which were asked the jury and the issues permitted by the court, the jury found that the complainant accepted the charter of 1847, and amendments made in 1849, 1856 and 1866, that it once insured lives, but ceased in 1854; that it now collects its premiums in cash; that it abandoned the note system 1st of July, 1855 ; that it held annual meetings of members; that it has paid all dividends declared up to this time in scrip; that it ceased to issue policies for more than one year on the 14th of February, 1852; that they were renewed by receipts ; that the right to cancel policies was reserved; that it does not appear that any was so cancelled contrary to the charter, unless quitting the states of South Carolina, Florida, Alabama and Mississippi was an exception'; that it ceased doing business in South Carolina, 20th of December, 1869 ; Florida, 10th of March, 1862 ; Mississippi, 10th of February, 1862 ; Alabama, in——1862, except Mobile, 9th of March, 1862 ; that it ceased to do business in those states for the reasons stated in the bill and amendments, and in the minutes in evidence as to Florida; that the surplus, when the bill was filed, was $912,803.19 ; and upon this verdict, the chancellor entered the following decree:

"1. That said company has the right to accumulate a reserve fund adequate to the necessities of said corporation, the amount thereof to be controlled by the directors.

"2. That the company, in its corporate capacity, is the sole owner of such reserve fund.

"3. That no member or stockholder of said company is owner of any part of said fund, or the income thereof, until the same has been set apart to him or her as a dividend; that it is optional with the company when and in what sums said dividends shall be declared.

"4. That in case such dividends are declared, none will be entitled to any part thereof but the members or stockholders of said company, at the dates of the declaration of such dividends respectively; that members and stockholders are synonymous, and none in this regard are members of said company, unless, at the time of declaration of such dividends, he or she holds a policy of insurance issued by said company for the term of one year or longer, but a renewal receipt shall be taken and considered as a new contract, and equivalent to a policy of insurance for the term specified in such receipt.

"5. That, in fixing the shares of members in such dividends, the same shall be according to the respective amounts of their premiums paid for the policy or renewal receipt for one year or longer, and without regard to premiums paid in any former year or on any former policy.

"6. That none are entitled to any share of such dividends, by reason of having been insured by said company, but who are not insured by it for one year or more when the dividends shall be declared.

"7. That said company may, nevertheless, pass any by-law changing the length of time for which it will hereafter issue policies, or on other subjects not inconsistent with the charter and this decree."

8. As to costs and fees.

Whereupon, Carlton *et al.* excepted, and assign error as follows :

(1.) Because the court sustained the demurrer and motion to dismiss the cross-bills.

(2.) Because the court refused to allow counsel for Carlton *et al.* to go to the jury, or introduce testimony, to show the excessiveness and disproportion of the reserve fund to the necessities of the company, which they offered to do.

(3.) Because the court refused to allow counsel for Carlton *et al.* to go to the jury, or introduce testimony, to show that, from 1855 to 1883, more than ten per cent of premiums, and more than ten per cent of profits, had been carried to

the reserve fund without their knowledge, and were held there ; and to show the years in which this was done and the amount thereof.

(4.) Because the court refused to submit to the jury each of the issues which he was requested to submit, as above stated.

(5.) Because the issues submitted to the jury, and their findings thereon, were not sufficient to furnish a basis for a final decree in this case.

(6.) Because each division of the decree, numbered from one to seven, is illegal, unwarranted by the pleadings, evidence or finding of the jury, and, singly or combined, they do not constitute a legal and proper decree.

Was there error in sustaining the demurrer and dismissing the cross-bills?

The demurrer rests on the following grounds :

(1.) For want of equity.

(2.) Because the parties named sue for themselves, and others in like relation, and the others are not named.

(3.) Because the allegations of want of knowledge or notice as to the reservations made are insufficient, and there is no allegation of fraud or concealment.

(4.) Because the allegation as to protest against the reservation is uncertain and insufficient.

(5.) The demand stated in the cross-bill is defective and insufficient, in that it appears upon its face to be a demand made by outsiders upon the convention of policy holders, and not action proposed for said convention by any member of it ; and because it does not contain the names of claimants.

(6.) Because each cross-bill "sets up matters not germane to the bill or its amendments, and not as defences thereto, but as original causes of action against complainant and in that, so far as its prayers for relief are granted (?) upon said demand, it is apparent upon its face that it is a cause of action which has originated since the filing of the bill and amendments, if it has originated at all."

Let us examine the demurrer in the reverse order in which its grounds are stated. The sixth ground raises the question, whether the cross-bills are germane to the main bill. Of course, if not, the court below was right to sustain the demurrer on this ground.

The main bill for direction made these parties defendants to a legal proceeding to divide a fund (or its issues) held by this mutual insurance company for distribution among its policy-holders at the time of the filing, and all others who had insured in the company having rights to part thereof. The cross-bills of Carlton et al. allege, in substance, construing them altogether, that:

(1.) The company is strictly a mutual insurance company, the very meaning of which is, that each policy-holder looks for indemnity against loss to the payments of each of the other policy-holders, and that each has a right to share in the profits in proportion to the amount paid by him.

(2.) The charter does not provide for a surplus fund like that held, but does provide for the distribution of any amount accumulated beyond the necessities of the company; by which is meant that all the funds received shall be divided, after the payment of losses and necessary expenses for the year.

(3.) To adopt the ideas of the bill and its amendment, would place policy-holders entirely at the mercy of directors.

(4.) The resolution of 1855 was *ultra vires* and void.

(5.) If not, it limited the reserve to $200,000.

(6.) The rule prescribed by the resolution of 1855 has not been followed, but each year more than the ten per cent allowed by that resolution has been reserved. The amounts of these excessive reservations are stated, and it is charged that such excessive reservations were knowingly, wilfully and intentionally made, and that even by the directors' own mode of calculation, there has been held a large excess above the amount which could be retained under any construction of the resolution of 1855.

(7.) "These defendants charge that they had no knowledge or notice whatever, either actual or constructive, of this illegal and improper addition to the surplus fund, which of right should have been divided among them and those in like circumstances with them. They never knowingly acquiesced therein, and never ratified the same, or agreed thereto; but, on the contrary, they protested against the same as soon as it came to their knowledge, and have ever since objected thereto and protested against it. These defendants charge that, immediately upon discovering the aforsesaid facts, to-wit: on June 5, 1883, and before the filing of the last cross-bill, they made upon complainant the following demand in writing, addressing the same both to the annual meeting of the stockholders of complainant and to complainant itself.

The written demand made, in brief, the following points: First: that these demandants should be recognized as having an interest in the surplus fund and its income.    Second. That there was no authority under the charter to create a surplus fund; and that, having been created by reserving part of the amounts paid in during the year in which they have been policy-holders, the illegal amount so reserved should be paid *pro rata* to the policy-holders of those years, and their share should be paid to them. Third. That the resolutions of 1855 limited the surplus to $200,000, and that all in excess of that amount should be divided *pro rata* among the policy-holders of the years in which it was reserved, and demandants be given their share. Fourth. That the resolutions of 1855 only allowed from five to ten per cent from profits to be reserved; that the directors had reserved more than that amount annually, and that the excess should be paid to those from whom it was withheld, including demandants.    Fifth. That if, for sound legal reasons, it is determined not to pay out at this time in money the amounts due demandants, their rights be established, and that their proportion of the income from the accumulated fund be annually paid to them.

Sixth. That neither the surplus fund nor the income thereon should be paid out until the rights of demandants should be recognized or passed upon by the courts.

These demands were met by a positive refusal. And as the defendants are threatened with a bar, unless they assert their claims in respect to the surplus fund in defence to the bill of complainant, they bring this cross-bill, in order that the entire matter may be determined in one litigation.

(8.) That the surplus is unreasonably and unnecessarily large, and not within the bounds of a reasonable discretion, and as complainant admits a want of discretion, it was prayed that a reasonable and proper limit be determined, and that all in excess of that amount be divided. Discovery was prayed, and the other prayers were in accordance with the allegations set out above.

And in addition to the foregoing, by amendment it was alleged that the company had published in annual reports and other publications, in order to induce insurance in this company, that all who insured would be interested in the profits during the term of their insurance; and that some of them were induced by these publications to become insured therein, and not only that they were ignorant of the fact that more than ten per cent had been reserved, but that nothing appeared upon the books of the company to give such notice.

1. Having filed the bill to ascertain who were legally interested in the fund, as well when increased as at its present stage, and having made these various classes parties to it, upon what principle rests the idea that these cross-bills are not germane, we cannot see. In 2 Daniell's Chancery Practice, 1548, it is said: " A cross-bill is a bill brought by a defendant against the plaintiff, and, if neces-sary, other parties, in another suit touching the same matter." These allegations certainly touch the same mat-ter, the very fund in question and future accumulations, and make them germane to the original bill. The same

author adds, that "it frequently happens that a com-
plete decree cannot be made without a cross-bill, or cross-
bills, to bring the whole matter in dispute completely
before the court. In such case, it becomes necessary for
some, or one of the defendants to the original bill, to file a
bill against the plaintiff, and, if necessary, other defendants
to that bill, or some of them, and bring the litigated point
properly before the court." These cross-bills bring these
points, germane to the very core of the bill, before the
court. So, also, on page 1550, it is said: "Where a de-
fendant seeks the aid of the court for the purpose of en-
forcing his rights, he must file a cross-bill." Here these
defendants allege rights and ask the court to enforce them;
therefore, the cross-bill was necessary, for the author adds,
"but when he relies upon his rights, merely by way of de-
fence to the relief sought against him, it is not necessary
to do so." So, in note 2 to the same page, it is said: "In
general, the defendant cannot have any positive relief
against the plaintiff, even on the subject matter of the
suit, except by cross-bill"—citing a great many cases
thereon. Here the defendants want positive relief. They
want their part of this fund, if it has accumulated so as to
be ready for distribution, and if equitably, they have a
right to part of it, and their part of its issues. They want
to know how much of it sprang from profits made while
they were members of the company, and what their *pro
rata* share of it is. They allege that it is too large, be-
yond the charter power to retain it, and beyond the reso-
lutions adopted by the directors themselves, and beyond
the necessities of the company to retain it, in order to meet
probable losses in future, and ask positive relief—the most
practical sort of relief—to have the money due them paid
to them.

So Story lays down the same principles in his Equity
Pleading and Practice, §§392, 391, 389, 399, notes 3 and
(a). See also Mitford's Pleading, 81; 13 *Ga.*, 478, 482;
14 *Ib.*, 167, 171; 1 Smed. and M. Ch., 376, 391; 6 Paige

Ch., 288; 11 Wheat., 446; 14 Blatch., 371, 373; 3 *Ga.*, 422; 61 *Ib.*, 329, 333–5; 36 *Ib.*, 332; 57 Ill., 422; 22 N. Y. Eq., 471; 15 Ala., 501, 513.

The Code makes an answer in the nature of a cross-bill stand as a cross-bill. §4181. So that the demurrer was not properly sustained on the ground that it is not germane. Nor do we think that the ground is aided by stating that the cause arose for relief after the original bill was filed. It arose by the bill, and is germane to it; nay, it existed before; knowledge of it may have come to defendants since the bill was filed. But for the allegations of the bill, it may not have been known or a suit been instituted; but if the bill uncovers facts transpiring before it was brought, and discovers equitable rights to the defendants, why should they not ask relief arising from those facts? Must they bring a separate suit in such a case? Equity does nothing by halves, but gives complete relief. He who seeks it must do it. Code, §§3084, 3085; 14 *Ga.*, 323; 36 *Id.*, 332. And he must do it, we think those cases rule, in the very case in which he himself seeks it, if the relief sought by the defendants be akin to the subject in regard to which he seeks relief for himself.

2. The fifth ground is equally indefensible. How are the defendants outside parties to a litigation into which they have been invited; and when they come in as classes, represented by certain individuals of each class, selected by complainant, for the reason that service could not be made on all the class, is it just to dismiss their cross-bill, brought by the select men the company itself served for all of the class, and thus turn out of doors, not only the class they represent, but the select men who were served by the company?

3. So also, in respect to the fourth ground, it appears to us, if they should prove what they allege, that the reserve fund is more than the charter or any resolution of the directors authorized, or than the necessities of the company for expenses and reasonable expectations of losses

required, that the protest against it is quite clearly expressed, and amply sufficient to make an equitabe issue thereon.

4. And so, too, in respect to the third ground—notice. The allegation is, that nothing is on the books of the company, from which it could be seen that more than ten per cent of annual profits had been reserved, and that a resolution of the directors announced that they would not go beyond that per cent on profits annually, or two hundred thousand dollars in bulk, and that they had no actual notice of any. sort.   Besides, it would be a hard rule to charge those interested in a mutual venture with others, managed necessarily by a few agents, by presumptions of any sort, except quite strong, almost imperative, with constructive notice that the agents and managers had done what neither the charter of the company, nor their own resolutions, nor the exigencies of the management authorized.

5. Nor is there anything in the second ground, "because the parties named sue for themselves and others in like relation and the others are not named."   When sued as a class, they may defend as a class, and if the cross-bill be a legitimate mode of defence, by asserting rights springing out of the subject-matter of the bill, and asking relief thereon, it may be filed by them as a class.

6, 7, 8, 9, 10, 11, 12, 13. And this brings us to the real issue made by this cross-bill, and the demurrer thereto, to-wit: is there equity in the cross-bill?

There is, if these classes, represented by the select men chosen by the complainant, who did not have insurance in the company at the time the bill was filed, had equitable rights to a part of the accumulated fund, to which the money they paid in, as they allege, contributed, by profits made while they were insured in the company.

The Code of this state declares that, " the contract of insurance is sometimes upon the idea of mutuality, by which each of the assured becomes one of the insurers, thereby becoming interested in the profits, and liable for

the losses, without a charter, such an organization would be governed by the general law of partnerships; when incorporated, they are subject to the terms of their charter." Code, §2836.

The necessary deduction from this legal principle incorporated into our Code is, that, except in so far as not changed by the charter, the general law of partnership, as to profit and loss, governs a mutual insurance company, just as the general law of partnership, as to profit and loss, governs all partnership *inter sese,* unless changed by the terms or articles of partnership. The stipulations between partners will control the partners and regulate their rights and liabilities *inter sese,* no matter what those rights and liabilities would otherwise be under the general law. When a charter is granted and accepted, and the entity called an incorporated company is created, the charter becomes the articles of partnership; or, to be more accurate, perhaps, in the use of language, the charter stands in the place of the articles of partnership, and modifies the general law as respects losses and profits, which, without its grant, would have governed, and the charter becomes the governor wherever the two authorities collide. Still, the general analogy between the entity based on mutual participation in profits and losses and the partnership based on the same thing remains; and, except as changed by the charter, equity will apply the general laws of partnership in respect to interest in and division of profits to the entity, which would be applied to such interest and division in the partnership, except in so far as the articles or contract between the partners had modified its application between the partners.

In the one case, the contract is made by the parties, and they make it what they please; in the other, it is made too by those who agree to it by becoming members, insuring in it, paying premiums and risking losses and drawing profits, but it, unlike a mere partnership, must be born of the state, and live so long as the state permits by the

charter which sanctions the contract made as each man enters; and the state also contracts, by the charter, with the entity, for the benefit of all who may become members of it.

The fundamental principle at the base of all partnerships is division of losses or profits, in some form or degree or other,—equal or otherwise, as the terms may be, so far as themselves are concerned. So our Code declares, §2836, *supra*, that in case of mutual insurance companies, "the idea of mutuality" involves the result that each assured becomes interested in the profits and liable for losses.

Does the charter of this company annul this idea of mutuality, or does it only regulate its mode and application, and enforce it, within certain restrictions therein made? It seems to us that it recognizes fully the idea of mutuality, and makes each assured an insurer and a participant in losses and profits. The fourth and controlling section on the point is as follows, as amended in 1849 and 1856:

"Sec. 4. *And be it further enacted*, That whenever said corporation shall make any insurance on any property, the member so insured shall pay the required premium in cash, or give his note or bond, well secured, for the amount of the insurance money, payable one day after date, and shall deposit in money with the treasurer of the corporation at least ten per cent of said note, which shall be entered as a credit thereon, and the funds thus raised may be applied to the payment of the losses and expenses of the corporation, and in the event of an accumulated surplus beyond the necessities of said corporation, the directors are hereby authorized to divide the same among the stockholders thereof, according to the respective amounts of their premiums, and the directors may, at any time when the necessities of the company require it, collect such further sums as may be necessary, by making assessments on said notes, in proportion to the original amount of each note, giving thirty days' notice by mail to each member, but no member shall, in any event, be liable to pay more than his premium net or cash premium."

Each assured is required to pay in cash, or give his note, well secured, for the insurance money, depositing ten per cent cash, and the funds thus raised go to the payment of

expenses and losses, thus making each liable for losses to the extent of his premium note or cash premium, but no more, as provided in the last clause of the section. And as to profits and participation in them, the section reads that the directors are authorized to divide them, when they become "an accumulated surplus beyond the necessities of the corporation" "among the stockholders thereof, according to the respective amounts of their premiums." Thus every stockholder is interested in the profits, because, when the fund, which, of course, is what remains after paying losses and expenses, swells "beyond the necessities of the corporation," and the excess becomes subject to distribution, he participates in the division. So obligation to pay losses to a certain extent, that is, to the amount of his premium, and participation in profits, when the fund reserved for the necessities of the corporation becomes larger than necessary, is the liability and privilege of each stockholder. The idea of mutuality is not therefore destroyed, but enforced, if not by the letter, certainly by the spirit of the charter. But the very name of the company indicates that mutuality is its character, and repeatedly in the pleadings the complainant avows that it was organized strictly upon the mutual plan, "and upon that plan all of its operations have been conducted."

What does "stockholder" mean in this section of this charter, and when must he be one, so as to participate in a division? Is he a stockholder at the time when the fund accumulated beyond the necessities of the corporation, or is he one only at the time when the division is made? If he had been for ten years a stockholder, and during those ten years profits had been made to the amount of half of this million of dollars, and had ceased to insure, or renew by receipt his policy, a week before this bill was filed, does he cease to be a stockholder, in the sense of being entitled to share in what his money helped to make? Suppose that he wished to continue and to renew by receipt, and the directors, as they could do, had

abandoned the state where he lived and his insured prop-
erty was located, or the territory in this state where the
property was located, and thereby had virtually cancelled
his policy, without fault on his part, and before this was
done and during his connection with the company, the
whole of this surplus fund had accumulated, is it the
meaning of the charter, full of the mutuality idea as it is,
that though he had paid in every cent which, by the terms
of the charter, he could be made to pay for losses, he should
have not one cent of profits which had swollen to so large
a fund during the time he was putting in his money, which,
with what others contributed. made every cent of the fund
for distribution ?  Suppose that, at the time of division, not
a stockholder then a member had contributed a dime to
the fund, is it to be divided among them only, and are all
those whose money made it to be turned off with nothing?
Is this the. construction which a court of justice, either
law or equity, can rationally put on the word stockholder,
when used in the matter of dividing what a mutual fund
had made?  The mutuality would be that those whose
stock made the money should get nothing, and those whose
stock made nothing should get all.   Stockholder cannot
mean here what it does in a stock insurance company,
where the owner of the stock may sell it, and another take
his place by purchase.   The only stock which is held in
this company, under this charter, consists of premiums paid.
to insure property, not transferable, except with the prop-
erty insured, and not then, except with the consent of the
company.   Stock paid into a company, not mutual, is tied,
on to no property, but passes, in the manner in which the
charter directs, from one to another person, at any price
agreed on by the parties.

The language of this charter is in the alternative as to
the mode of payment.  It might be by note for all the
premium except ten per cent, or for cash.   When the
business was conducted on the note system, and territory
was abandoned, or the policy-holder could, but did not,

renew his policy, and it became necessary to call for an assessment on his note or bond, could he plead in bar, "You would not renew for me, and therefore I will not pay that per cent"? Or, to put the case stronger, when he voluntarily ceased to renew, without any cause, and an assessment on his note was made and demanded, could he plead, "I am no longer in your company, and I will not pay it"? Would not the reply be, "We agreed to insure you for a year, on consideration that you paid this per cent when called on, and for the purpose of paying it, you are still a member of the company? We carried your risk in consideration that you responded. Had the risk been against us, you would have got the insured value of the property; but you were an insurer as well as insured, and you agreed to insure others while they insured you. Though now you are no member of the company, then, when the loss occurred, you were, and you must pay what you promised to contribute for losses." The charter still calls him a member of the company to contribute to losses. It says, "and the directors may, at any time when the necessities of the company require it, collect such further sums as may be necessary by making assessments on said notes, in proportion to the original amount of each note, giving thirty days' notice by mail to each member." What member? Only those still insuring, or all who gave their notes as members? "But no member," the charter adds, "shall, in any event, be liable to pay more than his premium note or cash premium." Again we ask, what member? Undoubtedly he who gave the note is the member alluded to, and is called such when the call is made on him, whether then insured or not, if the loss occurred when he was insured and insurer. So the same word, "member," is used in the beginning of the section, and a member, of course, is a stockholder. Shall he be a stockholder to pay losses, but not one to receive profits?

Unquestionably the note system was dropped, and the directors could drop it, because the charter, as amended,

puts it in the alternative, " the member so insured shall pay the required premiums in cash, or give his note or bond," etc.; but the cash simply took the place of the note, and whether the member paid cash or gave a note, the meaning of the word, as used in the statute or charter, is the same, and what it meant if one system was used is the same as it would have been had the other alternative been continued as the mode of payment of premiums.

Thus we conclude, from the statute of this state and the construction of this charter, that the idea of mutuality in the statute remains in the charter, and the true construction of the charter is, that a stockholder in this company, in respect to division of profits, is he who put stock in it in the shape of premium money, and if what he put in contributed to make a surplus fund of profits, whether in or out when the division is made, he remains a member to draw his share of such profits according to the amount of his premium paid, pro rated with that paid by others, who also contributed to the accumulation.

It must be borne in mind that, when the cash system was adopted in 1855; as the exclusive plan of the company, all sums that could be collected for losses at any time out of a member were paid; so that, whether he renewed or not, he had paid up all that he could possibly owe on account of the policy for that year, and having thus paid all he owed on losses, his equity to partake of profits is complete. On the note system, he need not pay till assessed; if not assessed until the note was barred, all unpaid was profits left in his pocket. So when he paid all the premium in cash, which took the place of the note, what was not needed for expenses and losses, or rather, in the cash system, probability of losses, ought to go in his pocket. The charter makes no distinction between the two modes. Necessarily, by the change, however, a reserve fund, which remained with the directors in the shape of secured notes under that system, under the cash system, must remain, in the shape of money, with the directors; and such a fund, just

as much as is necessary to provide for contingencies of probable loss by fire, should so remain. The excess over this should be divided from time to time among those who, under the note system, would have retained it in the part of the note unassessed and unpaid. The decree itself recognizes that stockholders and members are synonymous, and such must be the meaning of the charter. If a member when the money had been made, beyond what the necessities of the company required as a reserve fund to meet its exigencies, and when a dividend should have been, therefore, declared thereon, he remains a member, and therefore a stockholder, till it is declared, for the purpose of receiving his share, because he has paid all that the charter required him to pay for losses, and what he was entitled to for profits then was due.

Equity regards that done which should have been done. If the surplus over a proper reserve fund was in the coffers of the company, equity, therefore, if it appears that it should have been divided while the member was still insured, and that the division would have allotted to him a part, considers the dividend declared and his part given him. If the directors ought then to have declared and distributed the dividend, equity will decree that they do so now, and will distribute it as it would have gone then. So that, when the allegation in the cross-bills is that a surplus for distribution was on hand when the complainants in the cross-bills were insured, and that the premiums they paid contributed to it, equity will hold them entitled to it now, if it be still on hand and surplus still, and therefore the demurrer admitting the allegations in the cross-bills should have been overruled.

Indeed, the very essence of mutuality is, that those who contribute to produce assets are interested in proportion to their contributions, and if others manage for them, are beneficiaries or cestuis que trust, and the managers trustees; and equity will prevent misappropriation, or decree

restoration, if improperly withheld.    22 Conn., 133, 145–6; 24 Am. R., 172–3; 34 Me., 451; 57 N. Y., 196.

The chart of the managers or directors is the charter; they must be guided by that; if they go beyond its limits, equity will restrain them, at the suit of those interested; and if they accumulate a fund from profits in excess of that allowed by the charter for a reserve fund to meet casualties of fire, and bring that fund into equity to declare its status and owners and direct its distribution, or the distribution of its interest, equity will take charge of the fund and decree that the surplus be separated from the legitimate reserve, and divided among the equitable owners. So that, in the case at bar, if the fund whose status and the owners of which fund are inquired of by the bill, be more than the charter authorized, which defines it as a sum necessary for the corporation—which means necessary to transact its business and, by necessary implication, to provide for contingencies of fire—that surplus, beyond what is legally retained, is ready for distribution now among those true owners thereof, the equitable owners, those whose money made it, and equity will immediately, and in the same proceeding in which it defines the status and owners of the fund, turn it over to them.    The legal title to it may be in the corporation, but the true equitable title is in the contributors to it.    We think that the above is deducible from *Singleton vs. S. W. R. R. Co.*, 70 *Ga.*, 464, and *Georgia R. R. Co. vs. Smith et al., Comm'rs*, 71 *Ga.*, 863; 40 *Ga* , 582, 583, 620, 621, 623, 627; 4 Peters, 152; 57 Me., 286–7–9; 34 N. J. L., 489; 2 Conn., 579; 18 How. (U. S.), 331, 342–3; and Pickering *vs.* Stephenson, L. R., 14 Eq., 322, (2 Abbott's Dig., No. 55, p. 711.)

To construe this charter correctly, reference must be made to the entire fourth section, as amended by the act of 1856, now under review; to the note system, as well as to the cash system; for both are in it, and the meaning of it is reached only by examining it in the light of both. It was organized first on the note system, ten per cent of

cash only being paid in; and if loss occurred, assessments were made on the reserve to meet that loss, the reserve being those notes on the insured in the possession of the company, the insured being also mutual insurers with all others to the amount of their notes. When expenses and losses were all paid by the cash in and the assessments made on the notes, the notes were cancelled and the profits of each, thus mutually insured and a mutual insurer, was the unpaid part of the note thus cancelled, and not a cent more of which could be collected from the maker.

When the note system was abolished and a pure cash system took its place, the change simply put cash in the place of notes, less insurance, I suppose, being charged. But the charter had authorized a reserve fund; and the far-seeing managers provided for it in certain resolutions fixing ten per cent on profits as the annual contribution to that reserve fund, and for the remaining part of the profits scrip was to be issued annually to the policy-holders for one year, to be paid when the cash means of the company amounted to two hundred thousand dollars. So that they, the then directors, considered ten per cent on profits as the annual measure to pile upon the reserve fund, and for the balance scrip was to be issued, payable when that fund reached two hundred thousand dollars. This scrip was profits, which took the place of what was left unpaid in the notes of the policy-holders when cancelled. Whatever was not issued to a then stockholder entitled to it, he is entitled to that now; because he has paid all his contribution to the losses while insurer and insured, and is entitled to his share of profits while so insurer and insured.

14. We cannot see, as contended for by the able and learned counsel for the corporation, that the principle of mutuality was destroyed by the act of 1856, which makes the fourth section, cited above, read precisely as cited. It was not contemplated, either by the general assembly or

the corporation, to kill mutuality, or to inflict upon it any dangerous wound.  It authorized a change in the mode of contribution to the capital, the right to reserve a fund necessary to meet emergencies, and then retained the mutuality of all stockholders in participating in profits made during their membership, inasmuch as they had pre-paid their full share of the fund for losses.

We see very plainly that the sufficiency of the limit of two hundred thousand dollars cash, to fix the time when the scrip should be paid, cannot apply to all years, because the amount of risks varies with the different years.  According with the increase of business will be the increase of risk, and proportionately will the amount of cash necessary to meet that risk increase.  But it is not so clear how the per centum on profits annually applied to the reserve fund should be increased.  With the increase of the volume of business, the premiums and profits ought to increase, and increased profits ought to set off increased risks, and the per centum should be the same every year, unless in case of unusual destruction by fire, which is, I apprehend, provided for in the estimate originally made of ten per cent.  Besides these cross-bill complainants allege that these and similar resolutions fixing this per cent of scrip for annual profits, after deducting ten per centum, were published from year to year in order to invite insurance, and that some of them were induced thereby to insure.  If so, it would add weight to their right to hold the company to its publication and to keep the directors within the limits of reserve, which they thus fixed, and appropriate the balance to profits for stockholders.

15. The equity of those forced out without fault, is greater than that of those voluntarily retiring; for while the right to decline longer to insure in certain territories is conceded, it does not follow that, when the corporation does withdraw and decline to renew policies, it must not account for past profits made by the money of the Alabama, South Carolina, Florida or Mississippi policy-holders,

while they were insured. The company may refuse to renew,—nay, it may cancel a policy; but when it annuls for the future, it must settle fairly for the past. It may dissolve the partnership with some who were members, but it is liable for what it owed them at the dissolution.

But applying the analogy of partnership law again, it would seem clear that, as the corporation might dissolve, so might the corporators, such of them as chose not to do business longer in that concern, also dissolve. It is the right of all, of each, unless restricted by contract or charter, to cease to insure, and thus dissolve the relation; and exercising this right they forfeit no profits previously made, but carry into voluntary retirement their just portion of the profits made while members.

16. No statute of limitations can apply to all of these cross-bill complainants, because many of them—Carlton, for instance—were insured but a year or two before the bill. Besides, the relation makes a sort of trust, a continuing trust, and the statute does not bar, especially until the limit is complete after knowledge of the acts of the trustee which made the fund accessible for distribution. The allegation is, that the conduct of the directors in reserving more than ten per cent of profits was unknown, and on the books and nowhere else could it have been known by these defendants, no matter how diligent in inspecting records open to them; and that the filing of these pleadings by the complainant is the first notice they had thereof. Besides, deception in fact, though not in design, is alleged, which amounts to legal fraud, and the statute begins when it is discovered.

17. We do not see that any demand was necessary, in view of the facts developed in this case. It seems, however, that, by abundant caution, it was made prior to the filing of the last cross-bill, which seems to have contained all the allegations preceding it in substance. 61 *Ga.*, 329, 335; 29 *Id.*, 294, 273; 13 *Id.*, 287; 49 *Id.*, 373; 6 *Id.*, 265; 11 *Id.*, 438, 445; 32 *Id.*, 245; *Hooper & Co. vs. Crawford,*

September Term, 1883. But, really, where parties are called in by a stakeholder, whether directors, agents or trustees, to contest for a fund, where is the necessity of demanding it or the share claimed?

See, generally, on the above points, cited by plaintiff in error: 63 Me., 99; 7 Paige, 198, 202–3; 33 Conn., 446, 455–6; 42 *Id.*, 17, 27; 7 Allen, 255, 512, 517; 45 Barb., 510; 13 Ill., 516; Morawetz on Corp., §§381, 346, 344, 425, 405, 376, 403, 434, 404, 39 Ind., 289, 371; 50 Miss., 662; 57 Me., 286; 36 Ind., 423; 22 Conn., 133, 145–6; 83 Pa. St., 293; 9 Allen, 319; 34 Me., 481; 3 Mason, 311, 312; 57 N. Y., 196; 2 Conn., 579; 18 How. (U. S.), 331, 342–3; 34 N. J. L., 489; 4 Peters, 152; 15 Ala., 501, 513; 22 N. J. Eq., 471; 57 Ill., 424; Code of Ga., §§3084–5–6, 3193–7, 3255; 11 *Ga.*, 195, 438, 445; 32 *Id.*, 245; 6 *Id.*, 265; 49 *Id.*, 373; 13 *Id.*, 287, 478, 482; 40 *Id.*, 582, 623, 627.

18. The principles deducible from these authorities approach the questions made here, and throw light upon them; but, really, none cited by either side is so similar to the case at bar as to control it. The construction of charters is like that of wills—each is a separate thing, and ordinarily must be construed by itself. In the light of such authorities as vigilant counsel on both sides have produced, we read our own Code and the charter of this company, and construe it to mean what is indicated above.

It will be well to add that this opinion does not collide with the general rule that the declaration of dividends is mat ter much in the discretion of the directors of corporate bodies, and equity is loth to disturb their action. This case is without that rule, entirely untouched by it. Here the directors themselves say that they have a fund ready for distribution, in whole or in part—*corpus* or issues—and wish the court to instruct them in respect to the owners of it, with a view to its distribution. The meaning of which is, that they are ready to declare a dividend, but do not know among whom to make it, and hence ask instruction in the

premises. It is, in truth, a case made by trustees having assets for distribution, and inquiring, "How shall we distribute?" If this corporation were at an end, and all it had were assets for division at its dissolution, it would scarcely be doubted that all whose money helped to make the assets should share the profits. That is this case as to this fund. The corporation declares a part of its assets which it wishes to divide; *quoad hoc*, it dissolves, and all who contributed to make the assets should share them.

It follows that the cross-bills should not have been dismissed, and, of course, that the decree, being founded on a verdict in the finding of which the jury was not permitted to find upon the allegations in the cross-bills, necessarily falls. And here, strictly, the duty of this court ends; but counsel desire us to give a guide to the new trial which must be had, and we propose now to indicate the course which should be pursued, if the facts, as alleged in the cross-bills and admitted by the demurrer, be not contested as true, but be admitted on the re-hearing as the truth.

(1st.) The court below should ascertain the whole amount of the cash reserve fund on hand at the time of the trial and decree, including all accretions and interest.

(2d.) What amount is necessary to enable the directors successfully to operate and manage the affairs of the company, so as, with the cash premiums paid from time to time, to insure the payment of losses by fire.

(3d.) The balance on hand, after deducting this necessary reserve, will be the fund for distribution, and an equitable distribution thereof should be decreed.

(4th.) In order to make this decree, the court should ascertain the amount in scrip which was actually issued annually, and what should have been issued for each year after the deduction of ten per cent for reserve, and who were the policy-holders of that year, either by policies issued or by receipts renewed, and the cash premium each paid for that year; and thereupon it should decree that the difference, if there be any, between the scrip issued to each,

and what should have been issued after the ten per cent reservation, is, in equity, his money, and should be decreed to him as of that date now. And so on from year to year, since, under the amended charter, the reserve fund was put in operation, excepting, always, those policy or renewal receipt-holders who have sustained losses and been settled with.

(5th.) If this distribution among policy-holders of each year should not exhaust the fund for distribution, then the remainder should be divided between all who have paid money on premiums to the company at any time since the inauguration of the policy, under the amended charter, of a reserve fund, *pro rata* to the money contributed respectively, excepting, as before, those who sustained losses and have been settled with.·

(6th ) The present company, under its present management, is the best possible receiver.. Let it retain the fund for distribution as such; make public the decree by proper advertisement, specifying the classes, and, if practicable, the persons entitled thereunder; and pay, on demand, to each person entitled, or his legal representative, his share; and if no demand be made within seven years from the date of decree by any person so entitled, let him be forever barred.

(7th.) So long as the present charter shall remain unaltered, let the future accumulations from profits be divided among those who hereafter pay money on policies or renewal receipts, in proportion to the amount respectively paid.

It will thus be seen that the fundamental principle on which this opinion rests is, that this company, by its charter, became a mutual insurance company ; that no amendment thereto has altered the nature breathed into it when first the general assembly gave it birth, but it remains to-day a mutual insurance company; that thus liability for losses and participation in profits became an ingredient in the character of each assured and insurer, and there-

fore. when each paid up his whole liability for losses, he became entitled to share the profits, The venture was mutual between all the members, and while the legal title was in the corporation to everything. the equitable interest was in the corporators, whose contributions made it all. And while the charter provides for a division among stock-holders, that word is synonymous with members, and the true intent and meaning of the word, as used in respect to a division of profits, is members when those profits were made. as well as those who were members when dividends were declared, if their contributions helped to make those dividends. Therefore, if, in particular years, dividends declared, after deducting the reserve on profits, were below what was prescribed by resolution of the directors as their measure, the fund being brought into equity. equity will treat that as done which ought to have been done, and will decree to those who were members during those years, whether in the company now or out of it now. what ought then to have been paid them, to be paid first out of the fund in court for distribution.   Further, as the fund is brought into court now, and its legal status. in respect to true ownership, is asked, in order that part of it, or at least its interest and increase, may be divided, equity will regard such a prayer for instruction, with the view of dividing, as equivalent to the declaration of a dividend, upon such rules of equity and such status of the fund and its ownership as are just and equitable; and, inasmuch as it is impossible to determine precisely the exact equity of each of the assured and insurers by tracing the contributions of each policy-holder into all its fruits individually, it will consider each as having contributed to the fund in hand, if paid since that fund was inaugurated, in proportion to what each paid the company, and hold each contributor entitled to share in this dividend, which the directors contemplate, and in respect to the equities of which they very properly ask advice and direction.

19. Moreover, this court sees that the great trust com-

mitted to these managers of a great corporation has a double aspect. They must look to the future, as well as to the present and past. They manage a scheme, which will live when they are gone. They must be careful to transmit to their successors, for managing for future insurers and assured, a body politic as healthy and sound as that which they nurtured so wisely and well. To that end, they must guard the sinew and muscle—nay, the heart whence issues the blood, without which the body will waste and die—sinew, nerve, muscle, all perish—the credit of the company. To preserve that, there must be means to pay policies promptly when due by reason of loss, and the reserved fund, authorized by charter and preserved by them hitherto, must be so kept, to the extent which the necessities of the corporation demand. Equity tries to seat herself in their chairs and around their board, and, while keeping her eyes open to all the past, to see the rights and equities of all who are now and have been their *cestuis que trust*, not to shut them to those who will be the *cestuis que trust* of the future managment of the corporation ; but she will direct that justice be done to all.

Hence, the decree which this court would make, if facts admitted now be not contested, is, that a reserve fund, sufficient for the future necessities of this corporation, which will live when all of us are dead, be estimated and ascertained by the testimony of the directors and managers of it, and of such experts and others as may be examined on either side, and other legitimate testimony, and be preserved as a reserve fund ; and that the remainder of that in the hands of the directors, at the time of the decree, be divided among past contributors as heretofore indicated.

Little contributions from time to time, carefully husbanded and judiciously invested, have made a great heap in the hands of those entrusted with it, until it has become fit to be inquired into, and judicially investigated and adjudicated. The matter has been carefully considered. No parallel case has been found by this court, or cited by the

able array of counsel employed on every side, by which we may be guided out of a labyrinth, where the pathway to light and truth is not easily discerned. Streaks of light here and there have fallen upon it, and we have followed the course indicated by them. We hope we have emerged into broad daylight, recognized by equity, if not visible to those who look through glasses stained by prejudice or smoked with self-interest.

Judgment reversed.

Cited for the company : Acts of 1847, pp. 123, 128, 126; Acts of 1849–50, p. 207; Act 21st December, 1849, amendatory of the charter of defendant in error; Acts of 1849–50, p. 265; Acts of 1855–56, p. 477; 67 *Ga.*, 106, 113, 456, 459, 463; 21 Md., 51, 90, 91, 92; 80 Pa., St. R., 31 (12); Field on Corp., 103, 104, 109, 152, 155, 432; Pierce on Railway Law, 32; Angel & Ames on Corp., 279; 5 Watts & Serg., 223, 243, 245; 6 S. & R., 504; 9 Otto, 463; 12 Barbour, 27; 23 *Ib.*, 578; 3 Wallace, 583; 4 *Ib.*, 255; 61 *Ga.*, 467; Phillips on Ins., 523 (a); 52 *Ga.*, 640; 1 Wheaton 283, 6 Gray (Mass.), 77; 24 N. H., 428; 1 Beasley (N. J.), 333; Code of Ga., §2836; 11 Mich., 425, 444; 14 Am. Dec., 114; 12 East., 22, 340, 341; 18 Ver., 512; 50 *Ga.*, 479; 55 *Ib.*, 431 · 61 *Ib.*, 33, 614; Code, §4191; 11 *Ga.*, 556, 569; 43 *Ib.*, 15; 61 *Ib.*, 467; 33 Conn., 447, 455; 7 Paige, 198; 41 Conn.. 463; 55 *Ga.*, 329; *Mason vs. Ailanta Fire Co.*, 70 *Ga.*, 604; *Coates & Co. vs. Allen et al.* 71 *Ga.*, 787; 48 *Ga.*, 109; 54 *Ib.*, 384; 57 *Id.*, 341; 12 Wallace, 681; Code, §4181; 3 *Ga.*, 424; 13 *Id.*, 478; 14 *Id.*, 167; 1 Wallace, 167; 40 *Ga.*, 199; 45 *Id.*, 156; Code, §§4206, 4210; Rule 7., Rev. Code, p. 1355; 66 *Ga.*, 18; *Glenn & Son vs. Shearer*, 44 *Ga.*, 16.

The leading authorities for plaintiffs in error are cited in the decision.