Trippe, Judge.
The Memphis Branch Railroad Company brought suit against S. M. May for three installments of $100 00, which had been assessed on his subscription to the capital stock of the company. The defendant, amongst other defenses, pleaded:
1. That when his subscription was made, the charter of the company, approved October 10th, 1868, declared that the capital stock of said company shall be $500,000 00, in shares of $100 00 each, and that since his subscription was made, the company had procured the passage of an Act, approved Uecember 4th, 1871, amending the charter, which was injurious to him, to-wit: an amendment authorizing said company to commence work on said road whenever $100,000 00 shall have been subscribed.
2. That, after he had made his subscription, Alfred Shorter subscribed for $250,000 00 of said stock. That, at a called meeting of the stockholders, on March 20th, 1871, it was consented *85 that the said Shorter might surrender said stock to the company, on the ground that the subscription was Understood to be only nominal when made, and was made for the protection and benefit of the company, and that he was, at an annual meeting of the stockholders on the 1st September, 1871, allowed to make a relinquishment of said stock to’ the company, and that the release of Shorter was a release of defendant.
3. That said company had never been legally organized, *because the law requires that the annual meeting of the stockholders to elect a board of directors shall be held on the first Monday in May in each year, which was not done, the first board being elected on the 25th May, 1869, the second on the 21st May, 1870, the third on 1st September, 1871, the fourth on 6th May, 1872.
4. That the board of directors had commenced the construction of said road on a capital of $150,000 00, which amount was insufficient to build it to a point that would make it profitable to the stockholders.
5. That when he subscribed, it was understood and believed that said road, when constructed, was to be the broad or common gauge, whereas, the board of directors are proceeding to construct a narrow gauge road.
The suit was instituted in the Justice’s Court, in October, 1872, and, by consent, appealed to the Superior Court and tried in November, 1872. The whole question of fact and law was, by agreement of the parties, submitted to the Judge, and judgment rendered in favor of -the company for the amount of the assessment. Error is assigned on the ground that the Court overruled and gave judgment against each of said pleas.
The record shows that the facts recited in the pleas were true, with the modifications hereafter stated; also, that the first installment was assessed, and was due June 15th, 1870; that defendant had paid three installments of five per cent, each; that the twenty-five hundred shares subscribed by Shorter, and from which he was released, were subscribed “long after defendant had subscribed and paid a part of his installments;” that, besides Shorter’s subscription, a little less than $150,000 of stock has been taken; that the company commenced the prosecution of their enterprise on the 15th of June, 1870; that a bridge, costing $15,000 00, 'has been built; that between $40,000 00 and $50,000 00 have been expended, and the road graded to within four miles of the Alabama line, the terminus, by the charter, unless the road unite or consolidate with some other road, as, by its charter, it is allowed to do.
*A11 this had been done by November, 1872. It does not appear from the evidence when defendant first objected to or dissented from any of the acts of the corporation now complained of by him. Suit for.three installments was commenced in October, 1872. It may be reasonably inferred that he made his dissent some time previous to that date — say when *86 the first of the three installments for which he was in default was assessed. When that was, does not appear.
Here, then, was a railroad company, whose charter is that “the capital stock shall be $500,000 00.” No amount of subscription is prescribed as a condition precedent to an organization or the commencement of the work. The company organizes and commences the prosecution of the enterprise with a subscription of stock to the amount of about $150,000 00. That amount has never been as much as $500,000 00, even with the nominal subscription made by Shorter. Eighteen months after the payment of the first installment, and several months after Shorter had been permitted to cancel his subscription, an amendment to the charter was obtained, authorizing, amongst other things, the company to organize and commence work, when $100,000 00 of stock was subscribed, and legalizing all previous elections of boards of directors, and all the acts of the company theretofore done. Within five months from the passage of this Act, and at' the first annual meeting thereafter of the stockholders, regularly called with due notice, wherein more than three-fourths of the stock was represented; it was unanimously agreed to accept the amended charter.
It does not appear how much work had been done before this. One installment, at least of five per cent., had been assessed and paid. If the other two had been paid, then fifteen per cent, on $150,000 00 had been assessed and collected, and it is to be presumed appropriated towards the prosecution of the enterprise. If the company had thus organized and commenced work with $150,000 00, and expended fifteen per cent., no corporator thus contributing could repudiate the organization, or the obligations resulting from what had been done. *Instead of complaining that an amendment had been procured and accepted, allowing work to be commenced with $100,000 00, which had already been commenced with $150,000 00, it was only an Act legalizing that whereby he was already bound. Practically, such legislation and acceptance was surplusage as between the corporators who had thus contributed, and could only serve to protect the company against any complaint that might have been made by the State or third parties, that its action had been ultra vires, even, indeed, if that could have been done.
If the other two installments were not paid until after this acceptance of the amended charter, he would then be presumed thereby to have given his assent and ratification to the action of his company in thus accepting. It is worthy of remark that the defendant, who was examined as a witness, says that “due and legal notice was given of the several meetings of the stockholders.” These meetings were four in number. He does not deny having attended those of May 25th, 1869, when the first board of directors was chosen, and of May 21st, 1871, when the second was chosen, and only denies his being present at the meeting of March 20th, 1871, when it was agreed that Shorter might be released from his subscription. He does not say that he even *87 dissented from any action of the company, or of either of the boards of directors, or that he dissented, at any time, from any of the various acts which he now sets up as sufficient to discharge him from all liability on account of his subscription.
It is not doing violence to common sense or reason to presume, from all this, not only that there was no dissent, but, also, the fair and reasonable inference is that a member of an incorporated company thus acting, and who must have known all that had been done, did, in fact, ratify and assent to the same, and we doubt not the Judge who gave judgment did so find. A few authorities, only, are necessary to show that a member of a chartered company may, by his acquiescence or presumed assent, become bound by the acts of his company, and thereby be disabled from setting them up as a defense, *when he could have so set them up were it not for such presumed ratification.
In 16 Sergeant and Rawle, 140, where a subscriber- was sued on his subscription for stock, it was held that where a fraud had been committed on a subscriber by means of fictitious subscriptions, no action could be maintained against him for his subscription. “But where such subscriber has accepted the charter, and, by his own act put it in operation, he cannot avail himself of the fact that part of the stock was fictitious.” Subscribers who permitted work to be carried on without objection, held as assenting: Wright, 752. If a corporator acted or voted as such after change of charter, he is bound by the change: 48 Penn. St. R., 29; 10 Watts, 364.
Many other decisions might be given sustaining 'the same points, and it is true that there are some in conflict with them; but scarcely any can be'found that go so far as to hold that a subscriber may give his assent and act upon it, and his company with him, and then repudiate what he had before agreed to, and claim that he is discharged from his subscription by reason thereof. This would be in conflict with that principle which is the foundation of all liability, either in matters arising ex contractu or ex delicto, to-wit: that every one is liable for what he does by himself, or by any one for him, which he assents to or ratifies. Neither in law or morals is one allowed to blow hot and and then cold. A gift once, is a gift forever. A contract, when made, cannot be departed from without the consent of all parties thereto. The' law often implies .a contract. The assent of a party to a contract may.be, and is often, implied or presumed. It may be proven by circumstances, like all things else in law, and we, in this decision, only assert a doctrine, as old as the common law — the doctrine of circumstantial evidence.
We do not intend to do any violence to any right a corporator has under the charter of his company — what a great English writer calls “the proprietary contract.” Great abuses have been committed by a misinterpretation of such charters. The writer *88 above referred to says, with much force: “The *general principle underlying the right government of every incorporated body is that its members contract with each other, severally, to submit to the will of the majority in all matters concerning the fulfillment of the objects for which they are incorporated, but in no others. To this extent only can the contract hold:” Spencer’s Essays, Railway Morals and Railway Policy, 292.
This Court, in Winter vs. The Muscogee Railroad Company, 11 Georgia, 438, in an opinion pronounced by the present Chief Justice, held “that a material and essential alteration of the original contract would release the defendant from his stock subscription, unless his assent to such alteration could be shown.” And further, in the same case: “The original contract of the parties cannot be materially or essentially altered by an amended charter so as to bind the subscribers thereto, without their consent.”
We recognize these principles. They distinctly imply that in such cases, if the subscriber does assent to what is done, he is bound. We only hold herein that this assent may be proven in such cases, like it may be in all others — by circumstances, by acts, by acquiescence.
We conclude, then, that such continued acquiescence in, and such acts so strongly indicating defendant’s assent to the actings of the company, now complained of, disable him from repudiating the obligation incurred by his subscription; and this, especially, applies to the points raised in the pleas, as to the elections of .the boards of directors — the assessments being made and the work being commenced before $500,000 00, the whole of the capital stock, was subscribed, and the release of Shorter from his subscription. There were none of these acts but what were accomplished, or publicly declared and ente'red of record on the minutes of the company from eighteen months to two years before defendant made any complaint, so far as the record discloses. The resolution allowing Shorter to cancel his subscription was passed on the 20th of March, 1871, at a meeting of stockholders, duly called and published, with the announcement that that question would be one of the matters *for consideration, and the resolution recites that the company understood the subscription to be nominal when it was made. The other point raised by the plea of a change being made from the broad gauge to the narrow gauge may be said to be covered by the same principle. The resolution of the stockholders giving the-directors the discretion to use either gauge, was passed unanimously on the 1st of September, 1871, more than a year before any dissent, so far as can be ascertained from the record, was made known by the defendant. The only evidence as to what was to be the gauge of the road when the subscription was made, is by the defendant; “that he supposed, when he subscribed, the road was to be built the common gauge.” If the charter had prescribed the gauge, or if the subscription had been made on the *89 express condition-of a certain gauge, a subscriber who would act within a reasonable time after a violation of that- condition, could be heard either in a proceeding instituted by him to arrest such violation, or in one against him to enforce his subscription. But nothing appears to show there was any such condition or contract in this case as to make it binding on the corporation.
Let the judgment of the Court below be affirmed.