## FELTON *v.* HIGHLANDS HOTEL COMPANY.

1. Persons who procure contracts of subscription to the stock of a proposed corporation not in esse but which may be organized in the future are not issuers of such stock within the intent and meaning of that term as defined in the Georgia securities law (Acts 1920, p. 250).

2. Under the provisions of section 13 of the law just cited, in whatever character or capacity they may appear, persons as well as firms and corporations who purpose either to issue or sell stock in an existing or proposed corporation must file with the securities commission the statement prescribed by law; and failure to file such statement avoids the subscription, thereby relieving the subscriber and entitling him to the return of any payments made upon the illegal contract.

3. It is error to dismiss a petition upon general demurrer because a portion thereof fails to set forth a cause of action, if it also contains allegations which, regardless of the defective portion, entitle the petitioner to the relief sought.

4. A conditional subscription to the stock of a corporation is not binding until the condition has been performed; and where one subscribes to the capital stock of a proposed corporation, and in the contract of subscription the capital stock is fixed at a given amount, the whole of the

Corporations, 14 C. J. p. 562, n. 68; p. 593, n. 23.
Licenses, 37 C. J. p. 274, n. 99 New; p. 277, n. 43.
Pleading, 31 Cyc. p. 329, n. 61.

capital stock must be subscribed before the subscriber becomes liable on his subscription, unless there has been a waiver, either express or implied, of the condition precedent that the entire capital stock must be subscribed, or a stipulation in the contract of subscription that the entire capital stock need not be subscribed. In the present case there was no stipulation that the entire capital stock need not be subscribed, but on the contrary there was an agreement to return any money paid upon the subscription unless the minimum capital stock of $500,000 was subscribed. No waiver could be implied, since it is admitted that the payments by the plaintiff were made in ignorance of the fact that $500,000 of stock had not been subscribed, and he had the right to presume from the acceptance of his payments that this stipulation had been complied with.

5. The court erred in sustaining the general demurrer and in dismissing the petition.

No. 5854. JANUARY 10, 1928. REHEARING DENIED FEBRUARY 20, 1928.

Equitable petition. Before Judge Malcolm D. Jones. Bibb superior court. January 3, 1927.

A. C. Felton Jr. brought his petition against Highlands Hotel Co., alleging in substance as follows: Defendant is a Delaware corporation having an office and place of business in Macon, Bibb County, Georgia. In the year 1925 certain persons residing in and about Macon organized themselves into a voluntary association with certain named officers, for the purpose of promoting the building of a tourist hotel. This association, known as the Hotel Executive Committee, in March, 1925, entered into a contract with the Hockenbury System Incorporated, a Pennsylvania Corporation, wherein it was recited, that, pursuant to the purpose above mentioned, it had been determined to proceed with the sale of stock for the purpose of financing such proposed hotel, and for this purpose the organization had requested the Hockenbury System Incorporated to undertake the direction of the sale of the stock and otherwise to act as financial agent for the proposed hotel corporation. It was stipulated in this contract that the Hockenbury System agreed to direct and manage the "fund-raising movement" or sale of stock in the City of Macon and vicinity, to obtain the necessary capital sum of $600,000 from the sale of shares of the preferred stock, the work of the movement to begin about April 2, 1925; that the Hockenbury System should be paid, for its services in managing and directing the sale of stock, a commission of five per cent., with certain deductions and reservations, "settlement to be made at the close of the stock-sale date upon the figures of

an accredited public auditor," and in addition all expenses connected with the project, including hotel and traveling expenses of the financial directors of .the Hockenbury System; provided "the totel expenses of the stock-sale project" should not exceed six and one-half per cent. The contract was subsequently modified by changing the date for the beginning of the movement and "the intensive stock-selling week." After the defendant was incorporated it paid the Hockenbury System the commission and expenses stipulated for, to the sum of $20,420, and also paid for printing and advertising more than $5,000, and for luncheons nearly $2,000.

Pursuant to the aforementioned contract the contracting parties, during the months of June and July, 1925, "through an army of solicitors and agents, conducted an extensive and intensive house-to-house campaign to sell stock in such a corporation to be organized by and through the procuring of persons to sign forms of contract as hereinafter set forth, and as a result of said campaign about 1,000 persons, firms, and corporations signed such forms of contract," including the plaintiff, who, on June 29, 1925, signed for the amount of $2,000. The form of contract circulated and signed recited, that, in consideration of the agreements of others of like effect, and of the mutual promises and agreements of those signing such form, and of the benefits and advantages resulting to each of the signers, the signer thereof subscribed for and agreed with the Highlands Hotel Company, a corporation to be formed, to purchase, and the corporation agreed to sell and deliver, upon the terms therein set forth, so many shares of preferred stock of said corporation of the par value of one hundred dollars per share, and agreed to pay so much at the times stated. And it was "further mutually agreed as follows:" and then followed eight paragraphs, which briefly stated, are, in substance: (1) That, after the preferred stock shall be subscribed for and paid in full, the corporation will issue to the subscribers one share of common stock without nominal or par value, for every two shares of preferred stock paid for. (2) Certificates of stock to be delivered only after full purchase-price is paid. (3) The subscriber not to receive any dividends on either class of stock until paid for in full, and all past-due payments on account of subscriptions to stock to bear 7 per cent. interest until paid.

(4) Failure to pay any installment for thirty days after due rendered the entire amount remainding unpaid due and payable. (5) The interest on preferred stock to become cumulative two years from date of opening the hotel. Common stock to constitute the entire voting power of the corporation. (6) Agreement upon the part of subscriber to pay ten per cent. as attorney's fees if suit is brought to collect his subscription. (7) "This subscription shall become valid and binding only when actual bona fide subscriptions for $500,000 in preferred stock shall have been subscribed. If this amount is not subscribed, any amount paid thereon shall be returned to the subscriber." (8) No salesman has authority to vary or modify terms of the agreement.

On or about August 5, 1925, sixteen persons, not including plaintiff, were incorporated as Highlands Hotel Company, under the laws of Delaware, and defendant is now holding itself out and claiming to be the corporation the stock of which was to be purchased and sold, as above stated. In paragraph 10 of the petition it is alleged: "Plaintiff, relying upon the false representations of defendant's officers and agents that it was the corporation whose stock was agreed to be purchased and sold and had been duly organized in pursuance of said contracts, and was entitled to receive the payments called for in said contracts, paid to the defendant" the total sum of $1,000 in the installments stated. Petitioner alleges that actual bona fide subscriptions for $500,000 of preferred stock have never been obtained, and that therefore the contract is not valid and binding, under the terms of the contract; that the contract did not describe or specify the kind of corporation the stock of which was being purchased and sold, by indicating its objects, purposes, powers, incorporators, capital, or location; that the corporation was not in existence at the time petitioner subscribed and signed the contract, and it is therefore void for indefiniteness and uncertainty; that defendant is not the corporation the stock of which was to be purchased and sold, but an entirely different corporation. Plaintiff seeks to recover the amount he paid through misrepresentations and mistake. He charges that the stock-promotion scheme above described was a selling and dealing in "securities" within the meaning of the Georgia securities law, that nobody engaged in or connected with the promotion scheme made any pretense of an effort to comply with the said law,

and that the contract of purchase and sale of stock is void and subject to be rescinded, which plaintiff elects to do. He prays for judgment for the amounts paid by him, with interest and attorney's fees, and that it be adjudicated that defendant has no rights against him under the contract. In an amendment he listed numerous subscriptions which he alleged had not been paid, some by minors, others by persons alleged to be insolvent, many conditional, and all void for other reasons alleged.

The defendant filed a general demurrer, which the court sustained. The plaintiff excepted.

*John R. L. Smith* and *Joseph LeConte Smith,* for plaintiff.

*Harry S. Strozier* and *Brock, Sparks & Russell,* for defendant.

RUSSELL, C. J.   The plaintiff based his suit upon the provisions of the Georgia securities law as originally passed in 1920 (Acts 1920, p. 250), and as amended by the act of 1922 (Acts 1922, p. 156), and asked that a subscription to the capital stock of the defendant be canceled, and that he have judgment for the amount already paid by him upon the subscription against the defendant, the Highlands Hotel Company. The demurrer was based upon various grounds, both general and special. The special demurrers need not be considered, because the case was dismissed upon general demurrer; and some grounds of the general demurrer need not be dealt with by this court, because it is a fixed rule of jurisprudence that a general demurrer is insufficient to dismiss a cause of action, if any portion of the petition affords good ground for a recovery in behalf of the plaintiff.

1.   Conceding, as a court must for the purposes of demurrer, that the plaintiff's allegations are true, we think the trial court erred in dismissing the suit, because under the facts stated in the petition the plaintiff was entitled to recover if he established that the full subscription of $500,000 was not subscribed by persons from whom it could be collected, or if for any other reason the defendant had not secured the amount of collectible subscriptions specified in the defendant's subscription contract offering the stock for sale. Furthermore, we think the allegations of the petition require a finding in favor of the plaintiff under the provisions of the Georgia securities act, if the statements with reference to the procedure pursued in securing subscriptions to the capital stock are established upon a trial. If, as alleged in the petition, the

subscriptions to the stock of the Highlands Hotel Company were issued or sold without a compliance with section 13 of the law, which requires a very complete and explicit statement of the information to be given to the securities commission, any subscriber to this stock (which is class D), including the plaintiff, would have an election to rescind the contract and ask that it be canceled; and in case the subscriber has paid any money for such "securities" it is provided by section 35 of the act of 1920, supra, that he may recover the amount paid together with his reasonable attorney's fees.

The very evident purpose of the legislature in the passage of the original act of 1920 and in the addition of numerous amendments in the act of 1922 was to protect the public against imposition to which it might be subject on account of ignorance in financial affairs. Taken together, the two acts embody a very elaborate scheme, which, if followed under the rules passed and published by the securities commission, will go a long way toward remedying an evil of widespread proportions. The term "securities," as defined in section 5 of the original act of 1920, includes "stocks, bonds, debentures, notes, certificates of participation, certificates of shares of interest, preorganization certificates, and subscriptions, certificates evidencing shares in trust estates, or associations, and profit-sharing certificates." In this act there is a comma between the words "preorganization certificates" and the words "and subscriptions," thus reading "preorganization certificates, and subscriptions," but in the amending act of 1922 this comma is omitted, so that the section as amended reads "preorganization certificates and subscriptions." It is thus plain that the stock for which plaintiff contracted in this case comes within the definition of the word "securities" as embodied in the law. The securities law divides securities into four classes, A, B, C, and D. It is unnecessary to refer to the intrinsic qualities of each class as set forth in the act, further than to say that securities in class A and the sale thereof are not subject to the provisions of the act, and that by the provisions of section 12 of the act of 1920 "all securities other than those falling within classes A, B, and C, respectively, shall be known as securities in class D," which class is further defined in section 7(4) as "securities based on prospective income, which shall be known as securities in class D." The

stock in this proposed hotel corporation falls within class D. It therefore becomes pertinent to inquire whether the plaintiff in this case is entitled to ask for the cancellation of his obligation and the recovery of the partial payments made by him upon a stock subscription which he alleges was obtained in violation of the securities law of this State, upon the ground that neither the defendant nor any one acting for it had a right to sell the security or stock in question.

But it is strenuously insisted by counsel for the defendant that an association of gentlemen whose predominant motive was to procure an attractive tourist hotel for their city, and who, without any special purpose to make profits from raising a fund with which to build it, organized an association or executive committee to promote the enterprise by the sale of stock in a corporation to be later organized as the owner of such hotel, does not come within the purview of the securities act. The allegations of the petition will appear from the statement preceding this opinion. According to these allegations, it does not appear to us that this was to any great extent a purely voluntary movement, while, of course, in a sense the signing of each and every subscription was a voluntary act. The hotel executive committee was a voluntary association, but the promotion of the stock and its sale as a security within the terms of the Georgia securities act was accomplished by the Hockenbury System at an expense of something over $27,000, which naturally had to be deducted from whatever amount has been received from the subscriptions which have been paid in full or in part. The subscription contract which was signed by would-be purchasers itself states that the Highlands Hotel Company *is to be formed,* thus showing that there was not at that time any corporation in existence whose future earning capacity could be determined from past results; and it also appears that those who were taking subscriptions, not being in any way connected at that time with the Highlands Hotel Company (which was not then in existence but which upon its organization accepted the subscriptions), which of necessity must be the issuer of the stock, were only dealers within the meaning of the Georgia securities law. From a review of the facts stated in the petition we have no difficulty in reaching the conclusion that the contracts embodying a subscription to the stock of the proposed corporation fall within the purview of the Georgia securities law. ·

Section 13 of the securities act of 1920 (Ga. L. 1920, p. 256) declares that "No securities in class D shall be sold or offered for sale until there shall have been filed, in the office of the commission, statements and documents as follows:" Then follow requirements embodied in 15 subdivisions of the section, which concludes with the further requirement that there shall be given "such other facts relative to such securities and the sale thereof as the commission shall prescribe." In this case the petition alleges that no statement was ever filed in the office of the securities commission. Section 14 of the act provides that at the same time the applicant shall file with the commission a duly executed written instrument, irrevocable, consenting that any action brought against such applicant arising out of or founded on the sale of such securities may be brought in any county in the State where such securities are sold, and, when the applicant is not a resident or was not organized under the laws of this State, shall also file with said commission a written instrument as power of attorney, authorizing some person who is a resident of this State to acknowledge or receive service of process in any proceeding that may be instituted against such applicant," etc. By the provisions of sections 15, 16, and 17 of the act those who sell securities in class D are required to take out a printed license which shall bear at the top in bold-face type "License for the Sale of Securities in Class . . 'D' under the Georgia securities law. Neither the State of Georgia nor the Securities Commission nor any officer of the State assumes any responsibility for any statement contained herein, nor recommends the securities described below." The Highlands Hotel Company did not apply for or obtain any license authorizing the sale of their stock by subscription or otherwise. So we are of the opinion that under the terms of the Georgia securities law the contract entered into by Felton was illegal and void, and entitled him to the relief prayed for.

While this court has not heretofore had occasion to deal with the question now before us, the Court of Appeals, in *Witt* v. *Trustees Loan Co.*, 33 *Ga. App.* 802 (127 S. E. 810), in a well-considered opinion delivered by Judge Bell in behalf of that court, held in a somewhat similar case that "Where an action was brought by a corporation on a subscription for its stock, designated as securities in class 'D' under the 'securities act' (Ga.

L. 1920, p. 250), it was a valid defense that the corporation, at the time of taking the subscription, had not complied with the provisions of section 13 of the act, as to the filing of certain statements with the securities commission, notwithstanding a license had been applied for and obtained from the commission." As pointed out by Judge Bell, section 35 of the act now before us provides that every sale and contract of sale made in violation of any of the provisions of the act shall be void at the instance of the purchaser at any time within twelve months from the date of the purchase or contract of purchase. The case at bar was instituted within twelve months and, as well ruled in the *Witt* case, according to the clear and unequivocal language of the act as expressed in sections 13 and 35, a sale of securities in class "D" may be voided by the purchaser within twelve months if there was a failure to comply with the requirements of section 13, regardless of whether a license was issued. In the case at bar the stress of argument has been laid by very able counsel for the defendant upon the fact that the promoters of the hotel company were not required to procure a license in order to enable them to sell their stock, because issuers of stocks are not required to procure the statutory license. Conceding, but not deciding, that sales made in behalf of the defendant in this case may be treated as sales by the issuers of the stock, which would obviate the necessity of applying for a license, it nevertheless seems to be manifest that under the provisions of section 13 it is a preliminary essential to the selling or offering for sale of any securities in class "D" that the statement prescribed in the section shall be filed. While issuers of stock may be relieved from taking out a license and the accompanying expense (*Smith* v. *State*, 161 *Ga.* 103, 129 S. E. 766), it clearly was not the intention of the legislature to allow would-be organizers or promoters of corporations whose stock was designed to be vended to the general public to determine for themselves whether they were issuers, or, for that matter, to define their own relationship in any of the particulars embraced within the statute. Without the provisions of section 13, which requires the statement of the purposes of the proposed corporation as well as its probable ability to perform its undertakings, it would be possible for many corporations to organize without the knowledge of the securities commission, and great damage perhaps to be done to the public

before their existence was ascertained. The *Witt* case, supra, was one in which the contention that the contract of subscription was invalid was upheld for noncompliance with the provisions of section 13 of the act as to the filing of statements; for it appears that as far as the license was concerned this permit had been obtained by the Trustees Loan and Savings Co. As appears from the record, the Highlands Hotel Company is a foreign corporation, it being stated in the petition that the defendant is a corporation organized under the laws of the State of Delaware.

The State of North Carolina, under statutes very similar to our own, recognizes the necessity of imposing the same duty of making a preliminary statement upon any person, firm, or corporation intending to issue or sell securities, and certain statutes of that State, very similar to our own, have been interpreted by the Supreme Court of North Carolina just as we understand the meaning of the provisions of the acts of 1920 and 1922. Section 6365 of the Consolidated Statutes of North Carolina declares that "Before offering or attempting to sell any such securities to any person or persons, doing or offering to do any business whatever in this State, excepting that of preparing the documents hereinafter required, every such company shall file in the office of the insurance commissioner of this State, together with the fees prescribed for fidelity companies, the following documents, to wit: A statement showing in full detail the plan upon which it proposes to transact business; a copy of all applications for and forms of contracts, securities, bonds, or other instruments, which it proposes to make with or sell to its contributors; a statement which shall show the name, location, and head office of the company, . . and such other information, and in such form, touching its affairs as said officer may require." Then follows the provision similar to that in our own statute as to the license. Dealing with the validity of a note given in payment for stock under circumstances similar to those alleged in the petition in this case, the court held that a note given in a transaction which did not comply with the blue-sky law is non-enforceable as between the parties. Planters Bank &c. Co. *v.* Felton, 188 N. C. 384 (124 S. E. 849). Mr. Justice Clarkson, delivering the opinion of the court, said: "These organizers and promoters who sell stock in person or by agents must obtain license. If they do not obtain license, they are guilty

of a criminal offense. If they obtain license and sell stock, they must put the contract of subscription or sale in writing with the provision in it in the language of the statute. If this is not done, it is made a criminal offense. The purpose and intent of the act is to prohibit organizers and promoters, whether foreign or domestic, who organize and promote the sale of what is commonly known as 'blue-sky stock,' from doing business without complying with the statutes. The further purpose and intent of the act was to guard and protect an unsuspecting and trusting public from what are commonly known as 'wild-cat' organizers and promoters and their agents. Now the question arises, if these provisions are not complied with, is a note given for stock enforceable in the courts of this State? We think not, as between the parties. The courts would not lend their aid to enforce the collection of a note between the parties, given without complying with the statute and which makes the officer or agent who violates this provision of the act guilty of a crime. It would be contrary to public policy. The transaction is illegal—voidable, not void." In Burlington Hotel Corporation *v.* Bell, 192 N. C. 620 (135 S. E. 616), it was held that since neither the plaintiff to the action on the stock-subscription contract nor its agent had been licensed by the insurance commissioner as required by C. S. § 6363, which was applicable, plaintiff could not recover on the stock subscription contract. In that case the agent employed to promote the enterprise and sell the stock was the Hockenbury System Incorporated, just as in the case at bar; and it was agreed that the Hockenbury System Inc. was the agent of the plaintiff, employed to sell stock and receive a commission for the sale of stock; and while this statement is only contained in the petition in the case at bar, for the purposes of demurrer it must be taken as true.

2. But we are of the opinion that the petition should not have been dismissed upon general demurrer, even though the subscription taken was not invalid by reason of non-compliance with the provisions of the Georgia securities act. The subscriptions were not to become valid and binding unless there were actual bona fide subscriptions amounting to $500,000, and, according to the allegations of paragraph 11 of the petition, this amount was never subscribed. By amendment, in response to the defendant's demurrer, the plaintiff set out a list of all of the subscriptions to

the stock; to show the total subscription of $501,200, and proceeded to show that by reason of insolvency on the part of subscribers, and want of authority on the part of signers of the contract to bind the purported subscribers, and other reasons specifically stated, the amount of bona fide subscriptions is some thousands of dollars below the $500,000 specified in the contract. It is well settled that conditions such as that involved in the contract under consideration, that the subscription shall "become valid and binding only when actual bona fide subscriptions for $500,000 in preferred stock shall have been subscribed. If this amount is not subscribed, any amount paid thereon shall be returned to the subscriber," are binding and will be enforced by the courts. *Holliday* v. *Persons,* 158 *Ga.* 742 (124 S. E. 353); *Memphis Branch R. Co.* v. *Sullivan,* 57 *Ga.* 240; *Hendrix* v. *Academy of Music,* 73 *Ga.* 437. The plaintiff in the present case is not estopped to rely upon the breach of the condition precedent to which we have referred, because estoppel can not arise unless the party sought to be estopped has done some act by which the situation of the opposite party has been altered to his injury. Nor, under the allegations of the petition, can the defendant assert a waiver of the condition on the part of the plaintiff, because it is alleged that in making the payments the plaintiff acted in ignorance of the facts that the $500,000 of bona fide subscriptions had not been subscribed, and that the securities were being sold in violation of law.

*Judgment reversed. All the Justices concur, except Beck, P. J., and Atkinson, J., dissenting.*

BECK, P. J., dissenting. The case is here on exceptions to the judgment sustaining the general demurrer to the petition, in which the plaintiff sought to have canceled his contract for the purchase of certain stock of the defendant corporation, and to recover an amount which he had paid thereon, on grounds which are substantially stated as follows: (1) That the contract was a part of the promotion and organization of a corporation in disregard of the Georgia securities law. (2) That payments were made in the mistaken belief which had been induced by defendant's false representation that it was the corporation for the purchase of stock in which he had agreed. (3) That an express condition of the subscription contract had not been fulfilled, to wit, that it "should

become valid and binding only when actual bona fide subscriptions for" $500,000 had been subscribed, and that otherwise any amount paid thereon should be returned. A majority of the court are of the opinion that the judgment excepted to is erroneous for the reasons fully set forth and discussed in the majority opinion. I am constrained to dissent from this opinion, under my construction of the sections of the Georgia securities law which are directly controlling in this case, after giving careful and painstaking consideration to that act as a whole and to its manifest purpose.

The Georgia securities law is to be found in an act entitled. "An act to create and establish the Securities Commission," etc., approved August 17, 1920 (Ga. L. 1920, p. 250), as amended by an act approved August 21, 1922 (Ga. L. 1922, p. 156). I will refer to the two acts as the act of 1920 and the amendatory act of 1922. In the first section of the act of 1920 it is declared that it shall be known as "The Georgia Securities Law," and that it shall repeal and supersede the act approved August 19, 1913, known as the "Georgia Blue Sky Law." Sections 2, 3, and 4 of this act provide for the creation of a Securities Commission, the employment of an examiner, clerks, etc., and for the location and maintenance of its office. Section 5 contains definitions of words and phrases used in the act, and as amended reads as follows: "The words and phrases used herein shall, unless the context otherwise indicates, have the following meaning: The word 'securities' shall include stocks, bonds, debentures, notes, certificates of participation, certificates of shares of interest, preorganization certificates and subscriptions, certificates evidencing shares in trust estates or associations, and profit-sharing certificates. For the purposes of this act, the word 'securities' shall further include all contracts for the sale of territorial rights for which a consideration is paid or to be paid, and all contracts which entitle the purchaser thereof to receive from the vendor compensation, whether the same be for services to be performed, for discounts or special rates not afforded the general public on goods to be purchased, or any other compensation whatever accruing to the purchaser solely by virtue of the purchase of such contract. The word 'issuer' shall include every person and every company, trust, partnership, or association incorporated or unincorporated heretofore or hereafter formed for any lawful purpose, and organized under the laws

of this State or any foreign State or country, which shall have issued any security sold or offered for sale to any person or persons in this State. The term or word 'dealer' shall be deemed to include any person, company, trust, partnership or association, incorporated or unincorporated, selling or disposing of or offering to sell or dispose of any such securities through agents or otherwise, or engaged in the marketing or quotation of securities either directly or indirectly or through agents or underwriters, or any stock promotion scheme whatever."

Section 6 declares that no dealer shall, except as otherwise provided in the act, "dispose or offer to dispose of" any securities "without first being licensed to do so as hereinafter provided." Section 7 divides securities into four classes, "A," "B," "C," and "D." It is not necessary to give descriptions of the securities designated as being within classes "A," "B," and "C;" but paragraph 4 of section 7 is as follows: "Securities based on prospective incomes which shall be known as securities in class 'D,'" and to this class the alleged securities, the character of which is involved in this controversy, belong. Sections 8, 9, 10, and 11 relate to securities in classes "A," "B," and "C," and need not be set forth here. Section 12 declares that all securities other than those falling within classes "A," "B," and "C," respectively, shall be known as securities in class "D." Section 13 provides that no securities in class "D" shall be sold or offered for sale until there shall have been filed in the office of the commission "statements and documents as follows:" Then follow sixteen paragraphs relating to the character, contents, and essentials of these "statements and documents." Section 14 relates to the appointment of an attorney in certain cases and service of process upon him. Sections 15, 16, and 17 relate to fees, license, time of taking license, form and contents of license. Sections 18, 19, 20, 21 and 22 relate to revocation of license, relicensing, violation of provisions of the act, prosecution, notice to be given before revocation, petition to reverse action of the commission, "escrow agreement," and certain supplemental statements. Section 23 requires that all advertisements published, etc., for the purpose of effecting sales of securities in class "D" shall contain certain specified matter, and that copies shall be filed with the commission. Section 24 relates to dealing in any interest in real estate not located in Georgia. Sec-

tion 25 to the examination of issuers of securities. Section 26 imposes liabilities additional to that now imposed by law upon any person, company, etc., falling within the terms of that section, and to the actions based upon such liability. Section 27 confers upon the commission authority to investigate the business and affairs of every licensee. Section 28 relates to the seal of the commission, and the report to be furnished by it to the Governor. Sections 29, 33, 36, and 37 denounce as crimes certain acts of dealers, solicitors, etc. Sections 30, 31, and 32 relate to relief from registration, fees, and certified copies of licenses. And in section 34 it is declared that "It shall be unlawful for any agent, broker, solicitor, officer, director, or other person to sell or offer for sale any securities in class 'D' as described in this act, in any other manner or form than as specifically set forth in this act; and any offer or sale upon any other terms or conditions other than as set forth in this act shall be prima facie evidence that such agent, broker, solicitor, officer, director, or other person offered or sold such securities for the purpose of defrauding the purchaser to whom such securities were offered or sold." Section 35 relates to unlawful sales in violation of the provisions of the act, and is in the following language: "Every sale and contract of sale made in violation of any of the provisions of this act shall be void at the instance of the purchaser at any time within twelve (12) months from the date of such purchase, or contract of purchase; and the seller of the securities so sold in violation of any of the provisions of this act, and each and every solicitor, agent, or broker of or for such seller, who shall have knowingly performed any act or in any way furthered such sale, shall be jointly and severally liable, upon tender to the seller or in court of the securities sold, to the purchaser for the amount paid, together with his reasonable attorney's fees in any action brought to recover such amount." Section 38 contains a provision, if any part of the act is declared invalid, to uphold the remainder of the act. Section 39 declares that the act shall be effective on approval, etc. And section 40 repeals conflicting laws. The amendatory act approved August 21, 1922, is also quite lengthy and makes many changes in the original act. Such of them as are essential to this decision will be hereinafter referred to.

After carefully considering the entire act section by section, I

have reached the conclusion that in view of the character of the defendant corporation and the purposes of its organization and the methods by which subscriptions to its stock were obtained that were essential to its organization, it was not under any necessity or legal duty to take out the license required in the act of 1920, or under the changes made by the amendatory act of 1922, or under any of the new sections added to the original act by the last act. Section 15 of the act of 1920 required that the commission, when satisfied of the good repute in business of an applicant for a lisense, etc., should register the applicant as a licensed dealer in the securities referred to, and issue to him a license, etc. This section in the original 'act was stricken by the amendatory act and a new section substituted therefor, but so far as relates to the question here involved the changes made by the new section 15 are not material. Both the old and new section 15 requires that the commission, when satisfied of the showing made, etc., shall register the applicant as a licensed dealer, and the balance of this new section 15 merely relates to fees and the renewal of the license. And the new section 16 of the amendatory act, striking section 16 of the original act, makes it the duty of the commission to license agents of the issuers of securities and of dealers and brokers therein on written application of their principal. If neither under the provisions of the act of 1920 nor the act of 1922 the defendant in this case was required to take out a license and to file in the office of the commission, as preliminary to the issuance of the license, the statements and documents provided for in section 13 of the original act, then the contract to purchase the shares of stock specified in the contract was not illegal under the provisions of section 35 of the original act, and the purchaser of the shares would not be entitled, upon tendering to the seller the securities sold, or in court, to recover of the seller the amounts paid upon the purchase money of the stock.

It is essential to consider the nature of the enterprise to be carried into effect by the organization of the defendant corporation, and which could only be carried into effect by the organization of that corporation; and this must be ascertained from the petition filed by the plaintiff. From that petition we are informed that certain persons residing in and about the City of Macon "organized themselves into a voluntary association for the

purpose of promoting the building of a tourist hotel in or near the said city, and said association instituted what was known as a 'Hotel Executive Committee,' having a chairman, a sales-manager, a treasurer, and a secretary." And this organization entered into a contract with the Hockenbury System Incorporated, and in this contract it was recited that in pursuance of such purpose it had been determined "to proceed with the sale of stock for the purpose of financing such proposed hotel;" and in the contract it was agreed by the Hockenbury System that it should "direct and manage the fund-raising movement or sale of stock in the City of Macon and vicinity to obtain the necessary capital," etc. It would seem from the character of the enterprise and the association formed to carry it out that that association and the corporation into which it matured after organization, relatively to the stock in question in this case, were rather issuers of such stock than dealers in the same, and that the corporation employed to manage the campaign for the raising of funds and the securing of subscriptions to stock were the agents of such issuers. In the case of *Smith* v. *State,* 161 *Ga.* 103, 105 (supra), it was said: "It is true that one person may be both an issuer and a dealer; but this fact does not make an issuer a dealer or a dealer an issuer. The capacities of dealers and issuers are separate and distinct. The fact that one individual may act in the dual capacity of issuer and dealer does not destroy his separate character of issuer and dealer, although by acting in such dual capacity he may subject himself to liabilities and penalties imposed by law upon both of such characters. Issuer does not mean dealer. A dealer is not an issuer. Both of these acts undertook to define certain terms used therein. The act of 1920 declared that 'The word "issues" shall include every person and every company, trust, partnership, or association incorporated or unincorporated heretofore or heretofore formed for any lawful purpose and organized under the laws of this State or any foreign State or country, which shall have issued any security sold or offered for sale to any person or persons in this State.' This act likewise defines the word 'dealer.' The act of 1922 defines the words 'issuer' and 'dealer.' By this act issuer is given the same meaning as that given to 'issues' [issuers] in the act of 1920. By both acts 'The term or word "dealer" shall be deemed to include any person, company, trust,

partnership, or association, incorporated or unincorporated, selling or disposing of or offering to sell or dispose of any such securities through agents or otherwise, or engaged in the marketing or quotation of securities either directly or indirectly, or through agents or underwriters, or any stock promotion scheme whatever.' Both acts declare that the above words and phrases shall, unless the context otherwise indicates, have the above meanings. As these two acts undertake to define the meaning of the words 'issuer' and 'dealer,' and as there is nothing in the context to indicate that they are used with a different meaning, we can not construe the word 'dealers,' used in the caption of the first act, to mean and include issuers." And it was also said in the same decision: "The title of the act of 1922 declares that one of its purposes is 'to provide for the license of all dealers, otherwise than the issuers of such securities, and of their agents.' By the express terms of this title, no provision is made for the licensing of issuers. Only dealers and their agents are required to take out licenses. In the body of the act, in spite of this provision of the title, issuers of securities falling within class D are required to procure licenses to sell or to offer to sell the same; and it is made a felony for issuers of these securities to sell or offer to sell the same without such licenses. So it seems clear that the body of the amended act contains matter not only not referred to in the caption, but matter contrary to and in direct opposition to the matter referred to in its title." And it was then ruled in that case that "So much of section 36 of the 'Georgia securities law' as makes it a felony for an issuer of securities falling within class D to sell or offer to sell the same without first obtaining a license so to do, is unconstitutional and void, because it contains matter different from and contrary to that expressed in the title of this statute."

I have said that the organizers of this movement or association, which finally resulted in the formation of the corporation Highlands Hotel Co., bore rather the character of issuers than of dealers. I have used the expression "bore the character of," rather than holding directly that they were issuers, because no corporation at the time the stock was subscribed for had been actually formed. It was inchoate. No securities were in existence which could be issued so as to make the proposed corporation an

issuer; but it was an issuer in embryo. At any rate, partaking of the nature of an issuer, it should not be held to be a dealer so as to bring it and its agents under the highly penal provisions of this act, which denounces as felons those who fail to take out a license and to file the documents and information required before the license is taken out. The men who brought about the co-operation among the people of Macon and Bibb County for the purpose of having them act on a plan to create a corporation were not dealers in securities in the sense in which the expression "dealers" is used in the act under consideration. And the fact that some of the original promoters of the scheme and first subscribers to the stock may have had a design of selling a tract of land upon which the future hotel should be built and thereby to "unload real estate" upon the corporation, would not make the association or corporation dealers in securities so as to bring them within the operation of the act.

It is claimed by petitioner that the subscription contract is void for uncertainty and indefiniteness. This contention can not be upheld in view of the terms of the contract thus criticized. See Fletcher, Cy. Corp, 1177, § 535 et seq., and cit.

Having reached the conclusion that under the allegations of the petition the defendants were not guilty of any act in violation of the Georgia securities law in obtaining the stock subscription, petitioner, the subscriber, is estopped from attacking the contract made by him as void upon the grounds set forth in the petition. Whether the contract into which he entered would be binding upon him because the full amount of $500,000 of stock had not been taken by bona fide subscribers, and because of alleged irregularities in the organization of the corporation under the laws of the State of Delaware, nevertheless, by making the payments on his subscription, petitioner has ratified the transaction and made it valid as to him. He subscribed on June 25, 1925. The corporation was organized on August 5, 1925, and became incorporated under the laws of the State of Delaware and became a Delaware corporation, as contemplated in the contract of subscription, by the name of Highlands Hotel Company, the corporation with which the plaintiff contracted. The plaintiff could not, after making a substantial payment several months after organization of the corporation, claim that the corporation because of the irregularities was

not the corporation for whose stock he had subscribed, and would be estopped from asserting that the full amount of $500,000 of stock had not been taken. Some 700 of the subscribers had made payments upon their stock. These subscribers were making payments upon the faith of the subscription of this petitioner and of the fact that without making any attack upon the contract he had paid a substantial portion of the subscription. Before this suit was filed the petitioner, who had subscribed for $2,000 of the stock, had paid $1,000, having made the payments aggregating that sum on October 1, 1925, December 1, 1925, and February and April 1, 1926. His first payment was $400, and the other payments were $200 each. Not only were other subscribers to the stock under the same contract and same condition making payments upon their stock subscriptions, but it will be assumed that upon the faith of the subscriptions and the payments that were made the corporation was proceeding with this enterprise. Under such circumstances this petitioner is estopped from setting up the defense here sought to be set up against the unpaid subscription, and from recovering that which had been paid. *May* v. *Memphis Branch R. Co.*, 48 *Ga.* 109; *Memphis Branch R. Co.* v. *Sullivan*, 57 *Ga.* 240; *Midland City Hotel Co.* v. *Palace Market Co.*, 17 *Ga. App.* 704 (87 S. E. 1100).

I am authorized by Mr. Justice Atkinson to say that he concurs in this dissent.

### ON MOTION FOR REHEARING.

RUSSELL, C. J. A motion for rehearing has been filed, based upon five grounds:

1. Learned counsel insists, basing the contention upon the statement from the opinion that "it also appears that those who were taking subscriptions, not being in any way connected with the Highlands Hotel Company (which was not then in existence), . . were only dealers within the meaning of the Georgia securities law," that "the court overlooked the provision in section 35 of the Georgia securities law (Acts 1920, p. 35), to the effect that the seller and his agents shall be liable to a subscriber where the securities law has not been complied with." The court did not overlook that section, but had also in mind the ruling of this court in *Smith* v. *State*, 161 *Ga.* 103 (supra), in which it was held that the seller would not be criminally liable if he were also the issuer

of the stock. The majority of the court also had in mind the definition of "dealers," as it appears in the act of 1922 (Ga. L. 1922, p. 156) : "The term or word ' dealer ' shall be deemed to include any person . . selling or disposing of or offering to sell or dispose of any such securities through agents or otherwise, or . . [engage in] any stock promotion scheme whatever." Giving this section its plain, ordinary signification, any person who does any of the things set forth in section 5 is a dealer, and what is said in section 35 of the act, as construed in *Smith* v. *State,* supra, has reference merely to the fact that the issuer of the stock itself is excepted from the broad provision which renders "the seller and his agents" liable to any subscriber where the securities law has not been complied with. A request is made in this case that the *Smith* case be reviewed and overruled, it being the contention of the attorney for the securities commission that this should be done to "sufficiently protect the people of this State from being defrauded. . . It is the intent of the Georgia securities law to lock the stable-door before the horse is stolen. The decision in the case of *Smith* v. *State* knocked the hinges off the stable-door." The court declines to overrule that decision, for the reason that *"issuers"* alone being held to be exempt from the operation of the law (and the exemption ceasing if the "issuers" become "dealers" as defined in section 5), we are of the opinion that a proper construction of section 5 will afford adequate protection. In the case at bar, however, there is no difficulty, because it appears from the record that the defendant in error dealt in securities "indirectly or through agents or underwriters," and paid the Hockenbury System Inc., acting in one or the other of these capacities, nearly $30,000 without having made to the commission, in advance of selling any stock, the statement required by law that the company was to receive at least seventy-five per cent. of the money obtained from the sale of the stock and without any extra expenses such as luncheons, printing, etc., as appear in the present case.

The court did not think that the language quoted from the opinion in the first ground of the motion for a rehearing could be tortured into disconnecting any of the dealers in or salesmen of the stock of the proposed corporation (admitted to be disinterested promoters or agents of the proposed corporation as principal, which

after its organization ratified the acts of these agents), so as to relieve the corporation from liability in this case. Nothing is better settled than that if a corporation adopts the acts of its promoters and ratifies them and receives therefrom benefits, whatever the liability that attached to the promoters may be, such liability is by ratification assumed by the corporation. The defendant can not ratify or adopt such transactions in part and not in whole. If it takes the advantages, it takes subject to the infirmities. The transactions, being ratified and adopted by the corporation, are the same as if originally authorized or done by it. Civil Code (1910), §§ 3593, 3591, 3569. The Highlands Hotel Company can not claim the money agreed by the subscriber to be paid under the terms of the contract, unless it adopts the entire transaction in which the contract was entered into. If the transaction was illegal, as this appears upon its face to be, the taint of the illegality affects and corrupts every portion of the instrument. What may be the liability of individuals who disposed of the stock which was later taken over by the Highlands Hotel Company is not before the court; but we do hold that it is well settled that in a case like this, where the corporation to be formed is the principal, it is bound by the wrongs of its agents, and that in adopting and claiming the benefits of transactions of volunteer agents it must also adopt and ratify the wrongs committed, and accept the consequences imposed by law. 7 R. C. L. 81, § 60; Frankfort etc. Turnpike Co. v. Churchill, 6 T. B. Mon. 427 (17 Am. D. 159). "As a general rule, adoption or ratification results from the acceptance by the corporation, after its organization, of the benefits of the contract; having exercised rights and enjoyed benefits secured to it by the terms of a contract made by its promoters in its behalf, a corporation should be held estopped to deny its validity." 7 R. C. L. 82, § 61. A fortiori, having adopted a contract, if the contract is invalid the acceptance does not render it valid when, as in this case, the law expressly declares it to be void and unenforceable. It has frequently been held by this court that a corporation can not ratify an ultra vires act; much less then can it by ratification obtain benefits from an act forbidden by law and denounced as a crime so as to make the contract legal. According to the allegations of the petition in this case, section 13 (which was not altered or amended by the act of 1922, supra), which requires

a preliminary statement, section 34, which forbids "any agent, broker, solicitor, officer, director, or other person to sell or offer for sale any securities in class 'D' . . in any other manner or form than as specifically set forth in this act," and makes such sale or offer to sell prima facie evidence that the securities were offered or sold "for the purpose of defrauding the purchaser," section 35, which declares such sales void, as well as section 36, which makes the selling or offering for sale of any securities coming within class "D" without having first obtained a license guilty of a misdemeanor, were all violated.

The point ruled in *Smith* v. *State,* supra, does not affect the decision in this case. In that case it was held that so much of section 36 of the act as makes it a felony for an issuer to sell or offer to sell without a license is unconstitutional, because it is excluded by the title of the act. But it is expressly provided in section 38 of the act, that "should any court of this State declare *any section or clause* [italics ours] unconstitutional or invalid for any cause or reason, then such decision shall affect only that section or clause so declared to be unconstitutional or invalid, and shall not affect any other clause or section of this act." As said by Judge Bell in *Floding* v. *Gunter,* 36 *Ga. App.* 450 (136 S. E. 798), even if the defendant corporation as the issuer was not itself required to obtain a permit from the securities commission for the sale of the stock before putting the same on the market, the plaintiff, before proceeding as an agent or solicitor to sell or offer for sale such stock, should have obtained a permit or license to do so in accordance with the securities act. (Ga. L. 1920, p. 270, sec. 36). And the Court of Appeals proceeded to say: "Without a compliance with this statute by him (assuming such compliance to be necessary), the courts would probably refuse to enforce against a purchaser a contract for the sale of such stock," as we have, under the well-settled principle that the Highlands Hotel Company, when organized, could not adopt the benefits of the contract relieved from its burden. To place beyond peradventure our meaning in the excerpt from the opinion quoted in the motion for a rehearing, it is only necessary to insert, as we have in the original opinion, after the word "connected" the words "at that time," and to insert in the parenthesis, after the words "which was not then in existence," the words "but which upon its organization accepted the subscriptions."

2. The second ground of the motion for rehearing is based upon the contention that the corporation has no assets except payments on subscriptions, and that, "because the securities law was not complied with, every subscriber can bring a suit to recover what he has paid in, and recover that and costs and attorney's fees *in addition,* notwithstanding that the corporation has only what has been paid in. What is the corporation going to pay these additional amounts with? Can some subscribers get their payments and costs and attorney's fees out of what the others have paid in, and let these others lose that and then whistle for their own costs and attorney's fees? Who is going to say which subscribers shall be thus favored? What is going to be the criterion to determine who shall be the losers in this game of grab?" Counsel argues that the decision of the court "leads to impossible results which could not have been in the mind of the court when it was rendered." This ground is apparently not in compliance with the rule which requires grounds of a motion for rehearing to call the court's attention to some matter of law or of fact overlooked by the court. But, conceding for the nonce that the statement that the "results" could not have been in the mind of the court as a sufficient direction of the court's attention to something overlooked, it suffices to say that courts are not concerned with results when they come to undertake to construe a statute of the State. It would be a poor reply to A, justly entitled to a judgment against B, to say that the judgment would be worthless on account of B's insolvency, and therefore will be denied. Paramount over any consideration of "results" is the maxim, lex sic scripta est.

3. In the third ground is presented the argument that only applicants for licenses are required to file a "statement," by reason of the fact that there is no reference to the statement in the title of either the act of 1920 or that of 1922, supra. It would seem that the title of the act is broad enough to include any requisite deemed necessary by the General Assembly to prevent the perpetration of frauds upon the public; but that point is not raised in such a way as that this court can deal with it, learned counsel for movant being well aware that reference must be made to the particular paragraph of the constitution alleged to have been infringed on account of the paucity of the title.

4. Without conceding that the case of *Witt* v. *Trustees Loan & Savings Co.,* 33 *Ga. App.* 802 (supra), was not binding authority, or "incorrectly interpreted," movant, by the use of the words quoted from the fourth ground of the motion for a rehearing, admits that the court has considered—and therefore that the court has not "overlooked"—the decision cited, as must be the case in order to afford ground for a motion for rehearing. Rules of Supreme Court, 38, Civil Code (1910), § 6257.

5. In the fifth ground of the motion for rehearing it is said that the court overlooked the decision in the case of *Branch* v. *Augusta Glass Works,* 95 *Ga.* 573 (23 S. E. 128). The court did not overlook the principle there stated. It is fully recognized in this case. In the *Branch* case, to quote from the motion for rehearing, "it was held that a corporation could sue on a subscription for its stock made before it was created." Likewise we hold that the Highlands Hotel Company could sue on subscriptions taken in its behalf before its organization, if these subscriptions had been taken in accordance with law instead of in violation of law. In the *Branch* case a number of authorities are cited from other jurisdictions to support the proposition, to which this court adheres, "that where persons are authorized by law to obtain a charter for a specified legal purpose, they represent in the initial steps the yet unborn corporation, and whatever they *lawfully* [italics ours] do in the premises operates to the benefit of the corporation when it attains to complete legal existence, and it may then enforce contracts made in its behalf by its promoters." Since the passage of the Georgia securities law the foregoing ruling has not been altered; but as the statement "whatever they lawfully do" theretofore only impliedly excluded unlawful acts, the General Assembly by the passage of the securities law expressly outlawed unlawful acts by promoters, and provided that if the corporation chose to adopt these unlawful acts as its own, no benefit should accrue from such unlawful acts. In *Smith* v. *State,* supra, we held that under the language of the title Smith was an issuer, and it was said in the opinion that "issuer does not mean dealer." In holding in the present case that the various persons who sold stock in the Highlands Hotel Company are dealers of the stock issued or to be issued by that corporation, we do not conflict with the statement quoted. The motion for a rehearing is denied.